(No. 76107.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DONALD LEGO, Appellant.

*Opinion filed December 21, 1995.—Rehearing denied January 29, 1996.*

Charles Schiedel, Deputy Defender, and Charles Hoffman, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Roland W. Burris and James E. Ryan, Attorneys General, of Springfield, and James W. Glasgow, State's Attorney, of Joliet (Rosalyn B. Kaplan and Barbara A. Preiner, Solicitors General, and Arleen C. Anderson and Nancy L. Grauer, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:

This appeal (134 Ill. 2d R. 651(a)) by the defendant,

Donald Lego, follows the denial of his petition for post-conviction relief brought in the circuit court of Will County pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*). On September 14, 1983, defendant was charged by indictment with having committed the murder of Mary Johnson on or about August 26, 1983. Defendant represented himself throughout the proceedings both at trial and at his sentencing hearing. On March 16, 1984, a jury found him guilty as charged and three days later found no mitigating factors sufficient to preclude the imposition of a sentence of death. In his direct appeal, in which he was represented by counsel, this court affirmed both his conviction for intentional murder and the sentence of death. (*People v. Lego* (1987), 116 Ill. 2d 323.) The United States Supreme Court denied his petition for writ of *certiorari. Lego v. Illinois* (1988), 488 U.S. 902, 102 L. Ed. 2d 240, 109 S. Ct. 251.

On March 9, 1989, represented by counsel, the defendant sought post-conviction relief, contending, *inter alia*, that an impaired mental condition had rendered him incapable of validly waiving his right to the assistance of counsel. At the hearing on his post-conviction petition, although defendant put on substantial evidence, the State put on none. Defendant's principal evidence concerning this issue consists of the depositions of two experts, a psychologist and a psychiatrist, both of whom diagnosed defendant as suffering from organic brain syndrome and expressed the opinions that defendant was so afflicted when he waived his right to the assistance of counsel and that his decision to waive this right appears to have been a product of his mental condition. Following the hearing, the trial court, without explanation, found in favor of the State and against the defendant.

Although a court may consider a defendant's deci-

sion to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted out of " 'that respect for the individual which is the lifeblood of the law.' " (*People v. Silagy* (1984), 101 Ill. 2d 147, 179-80, quoting *Illinois v. Allen* (1970), 397 U.S. 337, 350-51, 25 L. Ed. 2d 353, 363, 90 S. Ct. 1057, 1064.) Because an accused who manages his own defense relinquishes many of the traditional benefits associated with the right to assistance of counsel, the accused must, in order to represent himself, knowingly and intelligently forgo those relinquished benefits. (*Faretta v. California* (1975), 422 U.S. 806, 835, 45 L. Ed. 2d 562, 581, 95 S. Ct. 2525, 2541.) If a defendant seeks to waive counsel, the trial court must not only determine that he is competent to stand trial but also satisfy itself that his waiver of this constitutional right is knowing and voluntary. (*Godinez v. Moran* (1993), 509 U.S. 389, 400-01, 125 L. Ed. 2d 321, 333, 113 S. Ct. 2680, 2687.) Ordinarily a waiver is an intentional relinquishment or abandonment of a known right or privilege. (*Johnson v. Zerbst* (1938), 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, 1023.) Although a defendant need not possess the skill and experience of a lawyer in order to choose self-representation competently and intelligently, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that " 'he knows what he is doing and his choice is made with eyes open.' " (*Faretta*, 422 U.S. at 835, 45 L. Ed. 2d at 581-82, 95 S. Ct. at 2541, quoting *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 279, 87 L. Ed. 268, 275, 63 S. Ct. 236, 242.) This requirement of knowing and intelligent choice calls for nothing less than a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. (*Patterson v. Illinois* (1988), 487 U.S. 285, 292, 101 L. Ed. 2d 261, 272, 108 S. Ct. 2389, 2395; *Moran*

*v. Burbine* (1986), 475 U.S. 412, 421, 89 L. Ed. 2d 410, 421, 106 S. Ct. 1135, 1141.) The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances of that case, including the background, experience, and conduct of the accused. *Johnson*, 304 U.S. at 464, 82 L. Ed. at 1466, 58 S. Ct. at 1023.

At defendant's arraignment on September 22, 1983, he informed the court that he would be representing himself throughout all of the proceedings. The court thoroughly advised him of his right to be represented by counsel, including the possibility that the death penalty could be imposed if he were found guilty, whereupon defendant assured the court that he "fully underst[ood] all of the implications." Later, when asked how much formal education he had, defendant declared, "I think rather, your Honor, in lieu of answering that question, that it would be more desirable to examine into the possible law experience cases handled in the Supreme Court of the United States—." Defendant indicated that he "could not" answer the question concerning the extent of his formal education, explaining, "That is not within my knowledge." Asked whether he had any experience either in representing himself or in counseling others concerning legal matters, defendant, 51 years old at the time, responded that he had "40-years experience *** inside and outside the courtroom and representing others as well as [him]self."

Approximately a week later, on September 27, 1983, at a hearing before another judge on a motion by the defendant, the State asked the court to admonish the defendant again, if he wished still to proceed *pro se*, concerning the nature of the charges against him as well as other relevant matters. In doing so, the court inquired again about the extent of the defendant's

formal education, including any courses he had taken. In reply defendant apprised the court, "[W]e can, quite necessarily, take the bigger part of the morning to name them all. But I can highlight. Sheetmetal school, I can highlight courses in philosophy, psychology, sociology, physiology, and of course law courses." He informed the court that all of the courses he had studied he had taken "within the confines of the State penitentiaries, and the reformatories throughout the Midwest." Asked by the court what law courses he had studied, defendant answered,

> "Oh, my God, I have studied I think it's with my name in the books that I have in front of me here \*\*\*. \*\*\* [P]reparation of certioraries and grantings thereof, just about all of the experience that I have had, your Honor, would be in terms of criminal law, independent of civil."

Amplifying, defendant added, "I am quite aware that the State has cases on me that they thoroughly know my past experience. It's been widely covered in years past, through television shows, twenty years ago, twenty-five, so I go way back."

Defendant indicated that some of the cases he had "represent[ed]" were in the criminal procedure books he had before him in court that day. When the court informed defendant that it was unacquainted with the cases about which he was speaking, defendant assured the court, as he would do repeatedly, "They're in just about every book that I have been in receipt of \*\*\*." Pressed to cite some of the cases in which he had been involved, defendant replied, "Oh, yes. This is one that's commonly used today. It is taught in the law schools. It's one that involved the case that I handled to the Supreme Court of the United States," which he named eventually as "Lego versus Twomey, and that was heard, writ of certiorari granted, and subsequent dividing of court four to three on the question that this is talking about." Pressed further, defendant explained that he

did not have the citation in front of him but advised the court, "I do have the—they're talking about my name in here, and that I handled it." Defendant assured the court that he had done all the briefing and legal research on the case and that he had "pro se'd all the way." Similarly, when the court inquired, "You say there were other cases in which you have been a pro se defendant?" defendant answered, "Yes. Your Honor, I have been associated—again if we're going to start citing them, I would rather that we would cite the most paramount one throughout the United States," which defendant identified as *People v. Lego* (1965), 32 Ill. 2d 76.

However, we note that the reported decision in that case, which was an appeal to this court following a conviction for robbery, shows defendant represented by appointed counsel. Further, one of defendant's exhibits admitted into evidence at the post-conviction hearing reveals that the circuit court appointed the public defender in 1961 to represent defendant on that charge. In addition, according to defendant's brief in this court, although he drafted a petition for writ of certiorari *pro se* in that case in 1971, thereafter he was represented by appointed counsel. In a memorandum decision (*Lego v. Twomey* (1971), 402 U.S. 928, 28 L. Ed. 2d 862, 91 S. Ct. 1528) defendant's motion for the appointment of counsel was granted, and the reported decision of the court (*Lego v. Twomey* (1972), 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619) shows that the attorney so appointed argued the cause on his behalf. We note as well that other of defendant's exhibits admitted at the post-conviction hearing out of which the instant appeal arises disclose that he was represented by counsel in Missouri in 1947 when a jury found him guilty of armed robbery and in Iowa in 1953 when he pled guilty to charges of robbery and jail break.

Continuing, defendant expressed the view that such inquiry was "wasting the Court's time" and was "a concerted effort to try to disparage the defendant in some way, to keep him from representing himself." He could demonstrate to the court if it became necessary to do so, he claimed, that he had represented himself and others in "something like three thousand to four thousand cases," "[m]uch [*sic*] of them *** very effectively." Defendant thereupon expressly waived the right to counsel, assuring the court that he did so understandingly and with full knowledge of the legal issues involved and describing himself as "very capable of the legal issues that will be presented throughout, to the conclusion of the trial." Over defendant's objection, the court appointed standby counsel. In the same vein, on November 21, 1983, at another hearing on motions of the defendant, he observed, "[I]f I'm given the rights guaranteed to a defendant in a pre-trial restraint situation, I think I amply handle this case properly and can handle it better than any lawyer or ten lawyers." Later, at a hearing conducted on January 3, 1984, concerning the motion of the public defender to withdraw as standby counsel, defendant argued in support of the motion. He apprised the court that he had acted "as counsel" over a period of 40 years, starting at the age of 10 when, for example, he had written letters to the parole board for other children in reform school. He had acted "in the capacity as a lawyer," he said, from that time "all the way up til the present." Having served for "many years" as "jailhouse lawyer" at Stateville, defendant explained to the court that because it had been necessary to assert the incompetence of counsel in many of the cases he had handled, which involved appeals not only to this court but to the United States Supreme Court, defendant had "bec[o]me pretty well known in this State in almost all of [its] hundred and two coun-

ties." Urging that the appointment of standby counsel was unnecessary in his case, defendant declared,

> "[T]his is not a case where a defendant comes out of a jail that has no knowledge.
>
> This is a case where the defendant has probably, as I mentioned before, filed three or four hundred briefs, studies the opinions of the highest courts of the land for forty years. So, I know of error, how it's weighed, how to raise it, how to present it ***."

Defendant further assured the court, "I've represented many capital offenses in my time, many sensational cases, some of them on certiorari, some of them in Supreme Court of Illinois, represented them in other states other than Illinois, State of Iowa, Missouri." Defendant also described himself to the court as being "very gifted at hearsay rules and the other rules of procedure" and possessing, in contrast to a lawyer who might represent him, "the unique advantage in knowing when a witness is lying."

On March 6, 1984, just prior to the presentation of opening statements at trial, the court renewed its offer to appoint the public defender to represent defendant, and the defendant rejected the offer once again, saying, "I think I'm a very capable opponent for the State's Attorney." After the jury had found defendant guilty of the offenses charged and before his sentencing hearing, the court inquired of defendant whether he wanted a lawyer to represent him at that hearing. Defendant answered, "I probably have the best attorney in the United States representing me," meaning, he told the court, himself.

As indicated above, admitted into evidence as one of defendant's exhibits at the hearing on his post-conviction petition was the discovery deposition, taken on June 20, 1990, of a correctional psychologist, Monte Williams, who had first examined defendant on March 28, 1984, upon his placement in the Condemned Unit at Menard

Correctional Center after having been sentenced to death nine days earlier on March 19, 1984, the same day the jury found no mitigating factors sufficient to preclude the imposition of a death sentence. This witness, who had been employed at the correctional center since 1981, makes the initial evaluations and diagnoses of all inmates entering the system.

Upon his initial contact with defendant, Williams thought that defendant was suffering from a very specific mental illness characterized by tangential thinking, perseveration of thought, a degree of circumstantiality, and confusion. He described "tangentiality" as the answering of a question by going off on a completely irrelevant tangent after uttering two or three words pertinent to the question; "perseveration" as the repetition of words or phrases or of concepts "over and over again," sometimes out of context, in response to different kinds of questions and different kinds of stimuli; and "circumstantiality" as a tendency by the individual to rely heavily upon circumstances rather than fact in responding to questions, that is to say, the individual "tends to run out of things to say and he just continues to dwell on a particular circumstance." Williams said that with nearly every question he put to defendant, he would have to draw him back to the topic and ask the question again. The witness thought as well at that time that defendant's cognitive functions were distorted by the mental condition he observed, that his ability to concentrate was diminished, and that his judgment was fairly consistently and seriously impaired. As Williams explained during cross-examination concerning the distortion of defendant's judgment:

> "If he cannot order his thought processes to weigh one thing against another, one idea or one concept against another, if he cannot keep his thoughts together enough to answer a simple question, then he certainly will not be able to collect his thoughts to weigh one decision against another."

Williams observed further that the defendant exhibited the mental symptom of "confabulation," in which a person confronted with a failure of memory fills in the gap with statements he simply makes up. Such statements may seem odd or even bizarre and tend to "stick out" as incongruous. Confabulation differs from lying because the latter is usually calculated, well thought out, goal directed, and pointed. The individual who engages in confabulation may not be aware that these thoughts are not true memories and may sometimes think that they are real. The defendant's tendency to confabulate some of his answers led Williams to the conclusion that some memory impairment had occurred.

Upon this initial examination of March 28, the witness diagnosed defendant as suffering from mixed organic brain syndrome with features of organic affective syndrome, organic personality disorder, organic personality syndrome, and a mild degree of dementia. He explained that an organic brain syndrome is the result of damage in the brain. The syndrome is "mixed" in defendant because three areas have been affected, namely, his emotions, personality structure, and cognitive functions. Williams based his diagnosis upon both his observations during the interview and the history obtained from defendant at that time indicating a lengthy history of substance abuse, primarily of alcohol, which defendant said he had consumed heavily since he was a youngster, but also of Benzedrine, a drug used with alcohol long ago. The defendant's condition would be obvious to most people, Williams said, although they would not necessarily conclude that defendant was mentally ill and might not know exactly what to call his condition but might think that he was merely "stupid or eccentric or not very bright." The witness saw defendant next on May 24, 1984, when he interviewed him again and found that the symptoms defendant presented

were "consistent with very lengthy chronic excessive substance abuse. There was much deterioration." On the basis of the witness' experience, he described the abuse as being more like abuse of alcohol rather than abuse of any other kind. Following his examination of the defendant on May 24, 1984, the witness referred defendant to "psychiatry," and defendant was seen by a psychiatrist, Dr. Sam Parwatikar, on December 13, 1984. The witness saw defendant again on a number of other occasions from May 28, 1986, until March 4, 1988.

With respect to the onset of chronic organic brain syndrome with dementia, Williams stated that it cannot appear "overnight" and takes "[y]ears and years" to develop. The defendant's mental condition was, he thought, the result of several years of abuse of alcohol involving daily consumption of very large amounts. In his opinion defendant was incapable of waiving the right to counsel when he examined him on March 28 and May 24, 1984, and probably suffered from the same mental condition observed on March 28, 1984, during the entire month of March of that year and in September of 1983. The witness doubted that defendant possessed in either September of 1983 or March of 1984 a reasonable awareness of his mental infirmities. When Williams saw defendant in 1984 he did not know that defendant had just represented himself at trial.

Williams expressed the further opinion that certain of defendant's statements to the court, among them the assertions that he had "represented many capital and sensational cases" in his time and was "very gifted" with regard to hearsay, indicate the possibility that defendant might have been mentally unbalanced, grandiose and delusionary in his thinking. If so, defendant's mental condition would, he said, definitely affect his ability to understand and appreciate the dangers and disadvantages of waiving the right to counsel. In his

opinion, if defendant really believed what he said, he would be unable to appreciate the dangers of representing himself. On the basis of these and other statements defendant made when he waived the assistance of counsel, his decision to do so and to represent himself appears, in Williams' view, to have been a product of his mental condition.

Also admitted into evidence as one of defendant's exhibits at the hearing on his post-conviction petition was the discovery deposition, taken on June 21, 1990, of Dr. Sam Parwatikar, a psychiatrist who works part-time for the Department of Corrections at the Menard Psychiatric Center evaluating and recommending treatment for mentally ill persons in the State correctional system. The witness first saw defendant on December 13, 1984, upon the referral of Williams and a security officer. After his initial examination of defendant, Dr. Parwatikar, who was chief psychiatrist at the time, saw defendant approximately monthly, and sometimes twice monthly, until June 27, 1985.

Dr. Parwatikar observed that defendant exhibited tangentiality, circumstantiality, and inappropriate affect, that is, his "emotional tone," as shown by his facial expression, for example, was inconsistent with the content of his conversation. Inappropriate affect and these particular types of changes in speech patterns are, he said, typical of and consistent with the diagnosis of organic mental disorder that had already been made by Williams. Dr. Parwatikar observed as well in the defendant's "push of speech," in which a person talks incessantly without being interrupted, also consistent with organicity. In addition to perseveration, the defendant exhibited paranoid ideation. Dr. Parwatikar described the defendant as distracted, agitated, and flighty and his behavior as fluctuating, so that at times he was cooperative and at others hostile and paranoid.

When cooperative, defendant appears to be normal although his cognitive functioning is still disturbed. Dr. Parwatikar stated that any time a person is "organic," there is some element of psychosis involved "right at the outset" and on January 15, 1985, found defendant to be psychotic, that is, out of contact with reality and acting in a paranoid way.

Dr. Parwatikar diagnosed defendant in December of 1984 as suffering from organic affective syndrome, or organic brain syndrome, concurring with Williams' assessment that alcohol abuse was the cause of defendant's organicity, in which there is a deficit in "gray matter," in the brain itself. Alcoholic degeneration is not correctable, and drugs do not alter the destruction of the cells but merely control the agitation caused by their destruction. Like Williams, Dr. Parwatikar thought that defendant suffered from a mixed organic disorder, which embraces, in addition to the affective disorder, some aspects of other kinds of organic disorder, including, in defendant's case, dementia and personality disorder, both of which would impair cognitive functioning. Unless a lay person were looking for this syndrome, he would not necessarily notice it.

Dr. Parwatikar said that from the point of view of a normal person, the judgment of a person suffering from this syndrome appears to be impaired, whereas the person so afflicted feels that his judgment is accurate, so that there exists a discrepancy between the evaluation of judgment as objectively seen and as subjectively perceived. This syndrome affects not only judgment but also comprehension, although judgment more so, with the result that such an individual, while he might be able to understand legal facts, would not necessarily be capable of understanding legal principles, which require the exercise of both.

Dr. Parwatikar described the course of development

of an organic brain syndrome due to chronic alcohol abuse as very gradual, occurring over months and years. Over time the person so afflicted engages in confabulation, losing contact with reality and distorting information he has received. As a result, he said, the person "might start thinking that he was better than what he was trained to be" or that he was in a place he had never been. Defendant could have acquired organic brain syndrome as a consequence of alcohol abuse during the years 1975 to 1983 when he was not incarcerated. Although Dr. Parwatikar could not say how long defendant had been suffering from organic brain syndrome due to chronic alcoholism, he stated with reasonable medical certainty that in September of 1983 and in March of 1984 defendant was suffering from the same condition he suffered from in December of 1984. The condition that Dr. Parwatikar encountered in December and that Williams observed in March of 1984 could not have developed in six months and would have to have occurred at least a year or more, and possibly longer than that, in advance of Williams' having first seen defendant.

In Dr. Parwatikar's opinion the defendant's mental condition was such that he could not have appreciated the dangers of waiving his right to an attorney. It affected his ability to make a decision as to whether to have a lawyer represent him because he believed he had done those things he advised the court he had done, although they involved distortions of or departures from reality. As a result, his decision was a product not of reality but of mental illness. In September of 1983 and in March of 1984 defendant could not have had, in Dr. Parwatikar's opinion, any appreciation of his mental instability "[b]ecause whatever he thought at that time to him was reality, although it contradicted the reality as we all see it; thus, he did not really appreciate that he

was in contradiction with the reality." On the basis of Dr. Parwatikar's observations of defendant over a period of six months beginning on December 13, 1984, and the history that was obtained, he concluded that in September of 1983 defendant was suffering from organic mental disorder, which would have prevented him from understanding the seriousness of the charges against him and his right to counsel.

Also admitted as one of defendant's exhibits was the report of Dr. Suraleah Michaels, a clinical psychologist who had interviewed defendant for three hours on December 8, 1992, and had reviewed part of the record in his case, including the depositions of Williams and Dr. Parwatikar as well as excerpts from the record of proceedings at his trial and sentencing hearing. Dr. Michaels concluded that defendant's decision to waive counsel was the product of the effects of his mental condition rather than the rational and reasoned product of his free will.

Preliminarily, we note that the State contends defendant has waived this issue for purposes of postconviction relief. However, its contentions in this regard are entirely without merit, and we turn, therefore, to the substance of the question. Relying particularly upon *Godinez v. Moran* (1993), 509 U.S. 389, 125 L. Ed. 2d 321, 113 S. Ct. 2680, the State criticizes defendant for pointing improperly to a mistaken view of his legal abilities because, it argues, neither a defendant's legal ability nor his miscalculation thereof is relevant to the validity of a waiver of the assistance of counsel. In *Godinez,* which held that the standard of competency for pleading guilty or waiving the right to counsel is no higher than the standard of competency for standing trial, the Court declared that "the competence *** required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the

competence to represent himself" (emphasis in original). (*Godinez*, 509 U.S. at 399, 125 L. Ed. 2d at 332, 113 S. Ct. at 2687.) The Court concluded that "a criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation" (emphasis in original). (*Godinez*, 509 U.S. at 400, 125 L. Ed. 2d at 333, 113 S. Ct. at 2687.) Although the State characterizes defendant's misperceptions merely as "[f]oolish overconfidence" in his own ability to represent himself, having no bearing upon the knowing and intelligent nature of a waiver, his experts, without contradiction, attribute these misperceptions to organic mental disorder, rendering defendant incapable of appreciating the dangers of waiving his right to the assistance of counsel. If by virtue of delusion occasioned by mental illness a defendant believes falsely that his legal skills equal or exceed those of virtually any attorney who might represent him, he can hardly be said to be aware of the dangers and disadvantages of self-representation or to know what he is doing and to be making his choice with eyes open. To disregard the cause of a defendant's misperceptions and to take the position that delusion born of mental illness has no bearing on the knowing and intelligent choice to waive the assistance of counsel would do violence to the most fundamental principles associated with waiver.

In a post-conviction hearing the defendant bears the burden of showing the denial of a constitutional right by a preponderance of the evidence. (*People v. Moore* (1969), 42 Ill. 2d 73, 80.) Although the State maintains that the determination of the circuit court following a hearing upon a petition for post-conviction relief may not be disturbed absent manifest error (*People v. Hall* (1993), 157 Ill. 2d 324, 331), the defendant argues that, because all of the evidence considered by the circuit court was documentary in nature, this court should

review the evidence independently and determine *de novo* whether he is entitled to post-conviction relief. However, we think that under either of these standards of review, the conclusion is inescapable that error occurred here.

In the complete absence of any countervailing evidence by the State, the defendant's expert testimony stands unrefuted. Only nine days after defendant's sentencing hearing, Williams, unaware that defendant had represented himself, concluded upon a routine examination that he was suffering from organic disorder caused by the abuse of alcohol, a condition characterized by the very features he continued to observe in defendant and Dr. Parwatikar noticed when he examined defendant approximately eight months later and, likewise, continued to see in the months following. Among the symptoms noted by both Williams and Dr. Parwatikar were impaired judgment and failure of memory, as shown by, among other things, defendant's tendency to confabulate. From their observations both men diagnosed the same condition, which, according to both, develops very gradually over a period of years. In the opinion of both of these experts, given the defendant's condition at the time each observed him, defendant suffered from this same mental condition in September of 1983 when he waived his right to the assistance of counsel. According to both, this mental condition rendered him unable to appreciate the dangers of waiving that right, and the waiver was itself a product of that condition. The testimony of both men is consistent, unequivocal, and uncontradicted.

When the testimony of Williams and Dr. Parwatikar is examined in conjunction with not only defendant's own statements from the record concerning the waiver of his right to counsel but also other evidence and matters of record refuting some of his pronouncements

about his prior experience, the manifest weight of the evidence shows that under the particular facts and circumstances here defendant's waiver of his right to the assistance of counsel was not knowing and intelligent. As such, it was, therefore, invalid.

Accordingly, we reverse the judgment of the circuit court denying post-conviction relief, vacate the judgment of conviction of intentional murder and the sentence of death, and remand the cause for a new trial. In light of our disposition concerning this issue, we need not consider any of the other issues defendant presents for our review.

*Reversed and remanded.*