THIRD DIVISION
October 17, 2007

No. 1-05-1923

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | No. 01 CR 27693 |
| | ) | |
| JAMES HOUSE, | ) | Honorable |
| | ) | Colleen McSweeney-Moore, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE THEIS delivered the opinion of the court:

Following a jury trial, defendant, James House, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2000)) and sentenced to 75 years' imprisonment. On appeal, defendant contends that: (1) the trial court abused its discretion when it disqualified defendant's privately retained counsel, Mike Fulton, because a potential conflict presented by the fact that he had also represented both of the State's eyewitnesses was insufficient to overcome the presumption in favor of allowing defendant to be represented by the counsel of his choice; and (2) the trial court abused its discretion in preventing defense counsel from introducing a prior consistent statement by eyewitness Cornelius Aaron to rebut an allegation of recent fabrication. For the following reasons, we affirm.

The following facts and procedural history are relevant to the issues raised in this appeal. Defendant was charged with multiple counts of first degree murder in connection with the shooting death of Isaiah Ewing on June 19, 2001.

Shortly after he was charged, defendant retained attorney Mike Fulton to represent him. At a November 2002 status conference, Fulton admitted that he had also been retained to represent Leander Coleman, one of the State's two eyewitnesses, in another unrelated criminal matter. The court admonished defendant of this fact and asked Fulton whether his representation of Coleman presented a conflict of interest. Fulton indicated that at that point in time, Coleman was denying that he ever made a statement to police implicating defendant. The court asked Fulton how he could fairly represent defendant when he was representing a witness against him in another matter. Fulton responded that he had only filed his initial appearance in Coleman's case and that he would withdraw from representation of Coleman.

At another status conference in March 2003, Fulton indicated that he had learned, but did not explain how, that defendant and Aaron suffered from a certain mental deficiency. Fulton indicated that he would be requesting psychological evaluations of both defendant and Aaron. That evaluation indicated that defendant suffered from a mental deficiency which impaired his ability to resist coercion, intimidation, or trickery. The State responded that what Fulton had said gave the impression that, at some point, Fulton had also represented Cornelius Aaron, the State's other eyewitness, who was also defendant's brother. Fulton admitted that he had represented Aaron previously in an unrelated armed robbery case, for which Aaron had been charged during the pendency of the murder case against defendant. Aaron was found not guilty of that offense

after a bench trial. At the next status conference, Fulton added that he had also represented Aaron in yet another unrelated case, which involved a gun possession charge. However, Fulton made clear that he was no longer representing Aaron. Nevertheless, the court instructed the State to file any motions regarding a "*per se* conflict of interest" prior to the next court date.

On that date, the State expressed its belief that Coleman and Aaron were going to "flip," or change their testimony to not implicate defendant. The State also indicated that defendant was going to sign a written waiver of the conflict of interest affecting Fulton. The court then admonished defendant regarding the conflict on the record, explaining, *inter alia*, that because Fulton represented Aaron, Fulton was loyal to Aaron and not to defendant. The court also explained to defendant that Fulton believed that defendant and Aaron suffered from a mental deficiency and that Fulton would be obtaining confidential psychiatric records regarding defendant and Aaron. Nevertheless, defendant agreed to waive Fulton's conflict on the record.

After hearing argument on whether a defendant could waive such a conflict, the court again admonished defendant about the nature of the conflict. This time, defendant indicated that he would like more time to talk with Fulton and think the matter over.

At the next status conference on April 14, 2003, the court ruled that defendant could not waive Fulton's conflict. The court observed that in certain circumstances, a conflict will override a defendant's right to be represented by the counsel of his choice. The court characterized the conflict presented in this case as "astronomical" because Fulton had represented both of the State's key witnesses in other matters. The court also recognized that defendant suffered from a type of mental disability. Accordingly, the court disqualified Fulton and appointed an assistant

3

public defender to represent defendant.

The court subsequently conducted a jury trial of defendant. In its opening statement, the State indicated that Aaron had given a statement to police implicating defendant in the murder of the victim and had testified consistently with his statement before the grand jury. The State further indicated that Aaron would be "brought before you to testify in this case, whether he likes it or not against his brother," but the State would "not even begin to predict what Cornelius Aaron might say face to face with his brother," or what kind of "headstands or back flips" he would make to protect his brother.

The following evidence was then presented. Eric Solomon, the victim's brother, testified that around 10 a.m. on June 19, 2001, he was walking with the victim in the alley behind Kolin Street near Cermak Road in Chicago. The victim subsequently got into a car with two men, whom Solomon identified as defendant and Aaron. Solomon gave the victim $20 with which to buy marijuana, and defendant, Aaron, and the victim drove away.

Sometime later, Chicago police were notified that a man had been shot on the ninth floor of 2240 South State Street, which is a building located in the Harold Ickes public housing complex. Cook County Deputy Medical Examiner Dr. Aldo Fusaro, who conducted an autopsy of the victim, determined that he had been killed by two close-range gunshot wounds to the head. Detective David Gehrke subsequently spoke with Solomon, who indicated that defendant and Aaron were the last people with whom he saw the victim. However, police were unable to locate defendant or Aaron for several months.

Chicago police arrested Aaron on October 31, 2001, on an outstanding arrest warrant for

his failure to appear in court for an aggravated unlawful use of a weapon charge. Following Aaron's arrest, Detective Gehrke spoke with Aaron at the police station. Aaron eventually told Detective Gehrke that he, defendant, Leander Coleman, and the victim went to the Ickes housing complex to purchase marijuana. Then, they went to the ninth floor of one of the buildings to smoke it, and defendant shot the victim.

Assistant State's Attorney Brian Hofeld testified that he also spoke to Aaron and reduced his statement to writing. Therein, Aaron stated that sometime in June 2001, he and defendant were standing outside of their home at 2320 South Kolin with their mother, sister, younger brother, niece, and grandmother when the victim approached them. The victim told them that he had a gun at his grandfather's house that he had stolen from a man known as "Pipe." Defendant and Aaron went with the victim to get the gun, then brought it back to their house. The gun was a "big 22-caliber rifle that could shoot [two] hundred times." Defendant and Aaron agreed to keep the gun at their house for the victim for a few days.

On June 19, 2001, the victim returned to claim the gun. The victim stated that Pipe and several other men "jumped on him" and beat him because they had learned that he had stolen the gun and they wanted it back.

Then, defendant, Aaron, and the victim decided to pick up Coleman and purchase some marijuana. They purchased the marijuana in the Ickes housing complex and decided to stay in the complex and smoke it there. Accordingly, they went up to the ninth floor of the building located at 2240 South State Street and smoked. At one point, Coleman left to urinate in the stairwell. Then, defendant pointed a gun at the victim's head and fired. Aaron began to run

away, and defendant fired a second time. Aaron then located Coleman, and they fled to the car. Defendant came down shortly thereafter, and they drove Coleman home. Defendant told Aaron that he shot the victim because he believed that he was going to "set him up and tell Pipe that he was holding the gun." Defendant explained that he did not want to shoot the victim, but he had to because he was a threat.

Shortly after Aaron's statement was taken, Assistant State's Attorney Beth Pfeiffer questioned Aaron in front of the grand jury. Aaron related substantially the same account of the shooting.

However, at trial, Aaron testified that on June 19, 2001, he and defendant encountered the victim at the corner of Cermak and Kolin. The victim told them that he had been "jumped" by Pipe and several other men. The three then walked back toward Aaron's and defendant's house. The victim asked defendant to take him somewhere, but defendant said that he could not. Then, another of the victim's friends drove up, whom Aaron did not know. The victim spoke to him, then got into his car. He told defendant and Aaron that he would be "right back," and they drove away. Aaron never saw the victim again.

Aaron denied that the facts contained in the handwritten statement taken by Assistant State's Attorney Hofeld were true. Rather, Aaron maintained that the detectives who interrogated him beat him, choked him, and told him what to say. They also said that if he did not comply, they would charge him with possession of cocaine in addition to the weapons charge he was already facing. One of the detectives then struck him again in the face and told him that he had two choices: either "get locked up" for a long time, or say what they wanted him to say.

6

Accordingly, Aaron agreed to cooperate.

Aaron then signed the statement written by Assistant State's Attorney Hofeld. He also added that he was not given the opportunity to read the statement or make any changes. However, Aaron admitted that he did not tell the grand jury or Assistant State's Attorney Pfeiffer that he was beaten by the detectives or that he had not seen his statement before he signed it.

On cross-examination, Aaron indicated that after testifying before the grand jury, he spoke with attorney Sladjana Vuckovic, of the First Defense Legal Aid clinic, whom his family had contacted to represent him following his arrest. However, when defense counsel asked Aaron what he told Vuckovic, the State objected on the grounds of hearsay, and the court sustained the objection. At a sidebar, defense counsel argued that the State opened the door to this line of questioning in its opening statement and in its questioning of Aaron, which tended to suggest that his testimony that he was beaten by detectives was a recent fabrication. The State responded that this testimony was not admissible to rebut the allegation of fabrication because it was made subsequent to the prior inconsistent statement. Defense counsel responded that this did not matter but, rather, all that mattered was that Aaron's statement to Vuckovic was made earlier than his testimony at trial. The court stayed the matter for further argument and did not permit the cross-examination.

Detective Gehrke denied any mistreatment of Aaron. Assistant State's Attorneys Hofeld and Pfeiffer both testified that Aaron was calm and cooperative when he spoke with them. He also told them that he had been treated fine by the detectives. In addition, Officer Robert Maloblocki, who processed Aaron when he arrived at the Central Detention Center following his

grand jury testimony, testified that he performed a visual check of Aaron for any physical injuries pursuant to standard procedure and found none. In addition, Aaron expressed no complaints about his treatment to Officer Maloblocki.

Police also arrested defendant on October 31, 2001. Detective Gehrke spoke with defendant following his arrest. Defendant ultimately admitted killing the victim; however, he refused to give a statement.

Police also spoke with Coleman, who at that time was incarcerated in the Cook County Jail awaiting trial on an unrelated offense. An assistant State's Attorney subsequently reduced Coleman's statement to writing and that statement recounted a nearly identical chronology of events as the one in Aaron's statement. Coleman also related a similar story to the grand jury. However, at trial, Coleman stated that the only reason he signed the statement was because the detectives were "going to put the case on" him if he did not.

After the conclusion of the State's case-in-chief, the court heard further argument on whether Vuckovic would be permitted to testify to her conversation with Aaron following his grand jury testimony. The State reiterated its argument that because the statement to Vuckovic was made after Aaron's handwritten statement and grand jury testimony, it was not admissible under the hearsay exception for prior consistent statements. The defense responded that the time when the statement was made was not relevant; rather, the only relevant factor was whether the statement was made prior to the motive to lie. The defense further contended that the allegation of improper motive in this case was that Aaron would lie to protect his brother when confronted with his brother face to face in court. Accordingly, the defense contended that Aaron's statement

to Vuckovic would rebut this motive to lie because it was made long before Aaron was faced with meeting defendant in court. The court observed that because defendant and Aaron were brothers on the date of the murder, on the date of Aaron's statements, and at the time of trial, Aaron's motive to lie always existed. Therefore, the court ruled that Aaron's statement to Vuckovic was not admissible under the prior consistent statement hearsay exception.

In defendant's case-in-chief, the defense presented the testimony of defendant's mother, brother, and sister, all of whom testified that defendant was home, sitting on the front porch all day on June 19, 2001 because his girlfriend at the time was braiding his hair. Attorney Mike Fulton also testified that no one from the House or Aaron family paid him to represent Coleman. Fulton also testified that defendant's uncle paid for Fulton to represent defendant. Defendant also testified on his own behalf that between the hours of roughly 11:30 a.m. and 3 p.m. on June 19, 2001, he was on the front porch with his family and girlfriend, who was braiding his hair. He further denied going to the Ickes housing complex that day.

The jury ultimately found defendant guilty of first degree murder. Defendant subsequently filed a posttrial motion contending, *inter alia*, that the trial court erred in disqualifying Fulton and in ruling that Aaron's statement to Vuckovic was inadmissible. The court denied the motion. It subsequently sentenced him to 75 years' imprisonment. Defendant then filed this timely appeal.

Defendant first contends that the trial court abused its discretion when it disqualified Fulton. Defendant claims that the "potential" conflict presented by the fact that Fulton had also represented Aaron and Coleman was insufficient to overcome the presumption in favor of

allowing defendant to be represented by the counsel of his choice.

The sixth amendment right to counsel encompasses both the right to counsel of choice and the right to effective assistance of counsel. People v. Holmes, 141 Ill. 2d 204, 217, 565 N.E.2d 950, 955 (1990). Of these two rights, an accused may exercise the right to counsel of choice even where it jeopardizes the right to effective assistance of counsel, provided that the accused makes a knowing, voluntary, and intelligent waiver of the latter right. Holmes, 141 Ill. 2d at 217, 565 N.E.2d at 955.

Nevertheless, there are certain limits to a defendant's right to insist on the counsel of his choice. People v. Ortega, 209 Ill. 2d 354, 358, 808 N.E.2d 496, 500 (2004), citing Wheat v. United States, 486 U.S. 153, 159, 100 L. Ed. 2d 140, 148-49, 108 S. Ct. 1692, 1697 (1988). Among those limits, the trial court can refuse to allow a defendant to waive an actual or potential conflict of interest where the interests threatened by the conflict overcome the presumption favoring defendant's chosen counsel. Ortega, 209 Ill. 2d at 361, 808 N.E.2d at 501-02; People v. James, 368 Ill. App. 3d 433, 436, 857 N.E.2d 839, 841-42 (2006). In Holmes, the supreme court identified four of the interests or factors that could outweigh the defendant's right to counsel of choice: "(1) the defendant's interest in having the undivided loyalty of counsel; (2) the State's right to a fair trial in which defense counsel acts ethically and does not use confidential information to attack a State's witness; (3) the appearance of impropriety should the jury learn of the conflict; and (4) the probability that continued representation by counsel of choice will provide grounds for overturning a conviction." Ortega, 209 Ill. 2d at 361-62, 808 N.E.2d at 502. However, this list of interests is not exclusive; rather, a court should seek to fairly consider all of

the interests that are affected by a conflict in a particular case. Ortega, 209 Ill. 2d at 362, 808 N.E.2d at 502.

Because nascent conflicts of interest are notoriously hard to predict, trial courts are given wide latitude to decide whether to accept or reject a proffered waiver of a conflict. Ortega, 209 Ill. 2d at 358-59, 808 N.E.2d at 500. Accordingly, we will not set aside a trial court's decision to disqualify a defendant's chosen counsel unless the trial court has clearly abused its discretion. Ortega, 209 Ill. 2d at 359, 808 N.E.2d at 500.

Here, the record discloses that the trial court did consider the interests articulated in Holmes as well as other interests relevant to the conflict situation presented in this case. The court considered defendant's interest in having the undivided loyalty of his counsel at length. Notably, when explaining the conflict to the defendant, the court articulated that one of the problems presented by Fulton's representation was that Fulton had a loyalty to Aaron and Coleman. As a result, the court explained that Fulton may not vigorously cross-examine Aaron and Coleman. Although the State believed that both Aaron and Coleman would recant, there was no way the court could have known that for certain at the time.

The court also considered the appearance of impropriety if the jury had learned of the conflict. Significantly, when the State indicated that Aaron and Coleman would probably recant, the State added that it would bring up the fact that Fulton came to represent both of them in other, unrelated criminal matters during the pendency of the murder charges against defendant. Presentation of these facts to the jury could have led the jury to infer that Fulton in some way improperly influenced the State's witnesses. See Holmes, 141 Ill. 2d at 226, 565 N.E.2d at 959.

11

The court also implicitly considered the State's right to a fair trial. The record before the trial court established that Fulton represented Aaron and Coleman in criminal matters that arose subsequent to defendant's indictment. Fulton would have acquired more information about Aaron and Coleman by virtue of his relationship with them than he would have ordinarily had about a State witness. Significantly, it was Fulton's request for confidential psychiatric information about Aaron and defendant that had led to the revelation that Fulton had previously represented Aaron. The fact that Fulton knew at all about Aaron's psychological problems suggests that Fulton had access to information about Aaron, a State witness, to which he may not have had access but for the fact that he previously represented Aaron. Fulton could have used this information to cross the bounds of proper cross-examination. See Holmes, 141 Ill. 2d at 226, 565 N.E.2d at 959. In addition, the State pointed out that both Coleman and Aaron indicated that they were going to recant after Fulton came to represent them on unrelated charges during the pendency of defendant's case. These facts suggest that Fulton could have gained an unfair advantage over the State and that Fulton could have exerted improper influence over the State's key witnesses. In these circumstances, the State would have been denied its right to a fair trial. See Holmes, 141 Ill. 2d at 227, 565 N.E.2d at 960.

In addition, the court considered the likelihood that Fulton's continued representation would have led to a reversal of defendant's conviction on appeal. The court considered the facts presented by the conflict scenario in this case in light of Holmes and the other precedent in existence at the time. In finding that defendant could not waive the actual conflict of interest presented by Fulton's representation, the court indicated that it was also concerned about the fact

12

that defendant suffered from a mental deficiency which impaired his ability to resist coercion, intimidation, or trickery. Certainly, a defendant's inability to fully appreciate or understand the consequences of a waiver should be a relevant concern in a trial court's decision to accept or reject a waiver. See People v. Lego, 168 Ill. 2d 561, 564-65, 660 N.E.2d 971, 973 (1995) (explaining that in order to waive the right to counsel, a defendant must have the mental capacity to make a knowing and voluntary waiver). In conclusion, we believe that a reasonable person could conclude that it would have been seriously unfair to the State, not to mention defendant, if Fulton had been permitted to continue to represent defendant. See Ortega, 209 Ill. 2d 369-70, 808 N.E.2d at 506.

The fact that the trial court inappropriately referred to the conflict scenario in this case as a "*per se*" conflict does not affect our conclusion. At the time that the trial court made its ruling, the supreme court had not yet decided Ortega, in which it clarified the meaning of the term. Moreover, in Ortega, the supreme court did not find such a mischaracterization to be material. Ortega, 209 Ill. 2d at 364, 808 N.E.2d at 537. Most importantly, the trial court applied the correct law, including Holmes, to the case at bar.

In reaching this conclusion, we find People v. Downey, 351 Ill. App. 3d 1008, 815 N.E.2d 756 (2004), upon which defendant relies, distinguishable from the present case. In Downey, which was an interlocutory appeal from a trial court order granting a motion to disqualify defense counsel, the Second District held that the trial court abused its discretion in disqualifying an attorney where it did not consider the factors articulated in Holmes and Ortega. Downey, 351 Ill. App. 3d at 1012, 815 N.E.2d at 759. Here, although the trial court did not

13

explicitly state that it was considering the <u>Holmes</u> factors and announce findings on each one, the record clearly establishes that the trial court heard argument on the relevant factors and based its decision on that information. Therefore, we cannot say that the trial court abused its discretion in disqualifying Fulton.

Defendant also contends that the trial court abused its discretion in preventing defense counsel from introducing a prior consistent statement by eyewitness Aaron to rebut the suggestion that Aaron recently fabricated his trial testimony, in which he recanted his statements to the police and the grand jury. Specifically, the defense sought to introduce the Aaron's out-of-court statements to First Defense Legal Aid attorney Sladjana Vuckovic, in which he claimed that he only gave the handwritten statement and implicated his brother before the grand jury because the police tortured him into doing so.

In general, proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony. <u>People v. Calderon</u>, 369 Ill. App. 3d 221, 234, 859 N.E.2d 1163, 1175 (2006); see also <u>People v. Heard</u>, 187 Ill. 2d 36, 70, 718 N.E.2d 58, 77 (1999). However, there are two distinct exceptions to this rule: (1) where the prior consistent statement rebuts a charge that a witness is motivated to testify falsely, and (2) where the prior consistent statement rebuts an allegation of recent fabrication. <u>People v. Richardson</u>, 348 Ill. App. 3d 796, 802, 809 N.E.2d 141, 146 (2004). Under the first exception, the prior consistent statement is admissible if it was made before the motive to testify falsely came into existence. <u>Richardson</u>, 348 Ill. App. 3d at 802, 809 N.E.2d at 146. Under the second, a prior consistent statement is admissible if it was made prior to the alleged fabrication.

1-05-1923

Richardson, 348 Ill. App. 3d at 802, 809 N.E.2d at 146. We will not reverse a trial court's evidentiary ruling on a prior consistent statement absent an abuse of discretion. Richardson, 348 Ill. App. 3d at 801, 809 N.E.2d at 146.

Here, although defendant contends that the second exception, recent fabrication, applies, we find that the present scenario actually involves an allegation of motive to testify falsely. In its opening statement, the State suggested that Aaron would recant based on his relationship with his brother. Specifically, the State suggested that Aaron may be reluctant to testify against his brother, explaining that Aaron would be "brought before you to testify in this case, whether he likes it or not against his brother." However, the State would "not even begin to predict what Cornelius Aaron might say face to face with his brother," or what kind of "headstands or back flips" he would make to protect his brother. Thus, the State's theory of Aaron's recantation was not that he simply created a new story prior to trial but, rather, that he would not implicate his brother face to face. Because Aaron and defendant were brothers long before the victim's murder, any statements Aaron made to Vuckovic at the police station cannot be said to have predated the existence of Aaron's motive to lie on behalf of his brother. See, e.g., Heard, 187 Ill. 2d at 70, 718 N.E.2d at 77 (finding that the trial court did not err in refusing to admit prior consistent statements of defendant's fiancee and friend because their relationship with defendant predated their statements). Accordingly, we cannot say that the trial court abused its discretion in refusing to admit Aaron's prior consistent statement to Vuckovic.

For these reasons, we affirm defendant's conviction and sentence.

Affirmed.

1-05-1923

QUINN, P.J., and CUNNINGHAM, J., concur.