2022 IL App (2d) 200475-U
No. 2-20-0475
Order filed August 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-116 |
| TEVIN D. RAINEY, | ) ) ) | Honorable Brian F. Telander, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in dismissing defendant's first stage postconviction petition as being patently without merit. Therefore, we affirm.

¶ 2    Defendant appeals from the first stage dismissal of his *pro se* petition for relief filed under the Post–Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)). In his petition, defendant raised several issues relating to ineffective assistance of appellate counsel. We conclude that the trial court did not err as dismissing defendant's petition as patently without merit and therefore, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4     After a bench trial, defendant was found guilty of three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(5, 8) (West 2014)), two counts of home invasion (720 ILCS 5/19-6(a)(6)(West 2014)), one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2014)), one count of aggravated kidnapping (720 ILCS 5/10-2(a)(6)(West 2014)), and one count of armed violence (720 ILCS 5/33A-2(a) (West 2014)), related to the home invasion, rape, kidnapping, and robbery of  N.T., an 87-year-old woman. He was sentenced to 120 years' imprisonment. In his direct appeal, defendant only raised issues related to sentencing. *People v. Rainey*, 2019 IL App (2d) 170338-U. We affirmed the trial court's sentence. *Id.* Defendant then filed the instant postconviction petition alleging ineffective assistance of appellate counsel for failure to raise several issues related to defendant's trial. We summarize the evidence adduced at trial.

¶ 5      Richard Chanilo testified as follows. He was employed as the store manager at the Thorntons gas station in Westmont. Illinois. Chanilo was working at the Thorntons the morning of January 1, 2015. Shortly before 5 a.m., defendant parked outside the gas pumps and entered the Thorntons. Chanilo had seen the defendant before and identified him in a photo lineup. Defendant purchased two packs of Swishers cigars. Defendant paid with a $5 bill, and Chanilo gave him two $1 bills and some coins as his change. Defendant then exited and went to a smoking station outside the building before returning to the car he had arrived in and leaving out of the Williams Street exit. Some minutes later a.m., defendant returned to the gas station. There were no cars in the parking lot. Defendant went down the first aisle of the store and grabbed a pack of condoms and then went to look at ski gloves. Chanilo heard a snapping sound, like the plastic tie holding the gloves together being snapped, and looked towards defendant. He brought a pair of gloves to the counter and asked Chanilo how much they cost. Chanilo told him the price. Defendant put the

gloves and condoms on the counter, said he was going to get his wallet, exited the store, and did not return. These interactions were captured on the store's video surveillance system.

¶ 6    N.T. lived at the Eagle Creek apartments in Westmont, which was across the street from the Thorntons. Her back patio door faced in the general direction of the Thorntons and was the closest door in the complex to the Thorntons.

¶ 7    N.T. testified as follows. On December 31, 2014, N.T. went out for dinner alone. She returned to her apartment, watched some television, and went to bed. She was wearing red checkered pajamas over green underwear. Shortly after 5 a.m. on January 1, 2015, she awoke to a flashlight shining in her face, and was being grabbed by her arms. Her assailant pulled down her pants and underwear and inserted his penis into her vagina. She was lying flat on the bed and the assailant was on top of her.

¶ 8    After a short while he stopped and told her to put her clothes on and that they were going to get some money. She then got dressed in her office, but did not put on the green underwear again. The assailant was always behind her while in her apartment. She told him she had $20 and gave it to him. He told her to get her ATM card and that they were going to go get some more money. She got her ATM card and put on her coat and they went out to her car. She got in the driver's seat, and he got in the passenger's seat.

¶ 9    They then drove to the TCF bank on Plainfield Road in Willowbrook. She attempted to place her card in the ATM, but dropped it and had to get out of the car to retrieve it. She then withdrew $300 from her checking and savings accounts. The assailant took the money. They got back in the car, and he told her to drive down Plainfield Road until they arrived at Cass Avenue. The assailant then told her to go south and get on I-55. She exited I-55 at Boughton Road, and he told her to go North on Janes. He then told her to turn into an apartment complex between

Boughton and 75th Street. They drove a little way into the apartment complex, and the assailant then told her to stop, and he exited the vehicle.

¶ 10     The assailant threatened that if she called the police, he would seek her out and kill her. The assailant had a gun in his hand which she described as a short grayish pistol. She was shown a photograph of a firearm recovered by the police and identified it as the gun her assailant was holding. After the defendant got out of the car N.T. asked for directions home, and he gave them to her. She then returned to her apartment.

¶ 11     She took off her coat and placed her bank card and keys on the kitchen table. She then went to the bathroom and took her clothes off. She saw she was bleeding and called 911. Because her assailant was always behind her, she did not get a good look at his face and could only identify him as an "African American male in his 20's, clean shaven." The prosecutor asked N.T. to look at the defendant, and then asked if she had ever given him permission to enter her apartment or car. She said she did not.

¶ 12     Police arrived at her apartment, and N.T. was transported to the hospital for her injuries. When she arrived at the hospital, a nurse administered a sexual assault evidence kit. She was then examined by Dr. Joan Cardone, an obstetrics and gynecological specialist. Cardone testified that N.T. had dried blood on the outside of her vagina and was actively bleeding from her vagina. She determined that her injuries would require surgery. N.T. was placed under general anesthesia and the doctor performed an examination and treated her injuries. The doctor testified that N.T.'s injuries were consistent with forceful penetration by a penis but could also be consistent with the insertion of an object. She further testified that the lacerations were more severe than what was typical in childbirth.

¶ 13     Shortly after 10:00 p.m. on January 2, 2015, Woodridge Police stopped a blue Buick which was leaving the Waterbury Apartment complex without its headlights on. Robert Jackson was driving the vehicle, and defendant was in the front passenger seat. Initially defendant gave a false name and date of birth to the officers. The officers attempted to look up the name and date of birth he had given them in the LEADS system but found no match. Defendant was then taken into custody. Police searched the vehicle and found a handgun underneath a black hoodie on the floor of the rear driver's side seat. This firearm was the one N.T. would later identify at trial as the gun wielded by her assailant. At that point Jackson was also taken into custody.

¶ 14     Defendant was taken to the police station and interviewed. He eventually gave the police his real name. It was stipulated that defendant had lived in the Eagle Creek Apartment complex from January to August 2014 in the building across the parking lot from N.T.'s. Despite this, when interviewed by police after being taken into custody, he denied being familiar with the area or the apartment complex. Likewise, defendant stated that he was staying with a friend in Bolingbrook during the morning of January 1, 2015.

¶ 15     Which was later refuted during the trial when defendant's aunt testified that on December 31, 2014, defendant was staying with her at her apartment in the Waterbury apartment complex in Woodridge. Sometime between 7 and 9 p.m., defendant left the apartment. She and her two daughters then left to go to church around 9 p.m. They did not return home until around 2 a.m. At that point she did not see defendant in the apartment but did not particularly look for him and instead went straight to bed. She did not see defendant again until 10 a.m. the next morning.

¶ 16     Several items were sent to the Du Page County crime lab for DNA analysis, including the sexual assault evidence kit, the green underwear N.T. was wearing prior to her assault, swabs taken from the exterior passenger door handle, interior passenger door handle, and interior passenger

door panel, the hoodie found in the back of Jackson's vehicle, and the firearm recovered from Jackson's vehicle.

¶ 17    During the trial, N.T. testified that after her assault she went on a ride along with the police, where she showed them the route she drove with the assailant. That ride along was recorded and she identified the spot she dropped the assailant off in the video. That spot was located at the back of the Waterbury apartment complex in Woodridge.

¶ 18    On cross-examination N.T. testified that she had a FOID card and was "familiar with guns." On January 1, 2015, she described the gun to police as a gray revolver. On January 6, she gave a recorded statement to detective Rolando Padilla where she again identified the gun used as a gray revolver. Likewise, at her evidence deposition she testified that when she used the word revolver it meant a gun with a spinning chamber.

¶ 19    Vanessa Martinucci of the Du Page County Crime Lab testified as an expert in the field of forensic biology and DNA analysis regarding her DNA analysis of the evidence in this case. She testified that she performed two types of analysis on the evidence in question, a short tandem repeat (STR) analysis, which analyzes the whole DNA profile, and Y-STR analysis, which uses the same process as STR analysis except it is directed only at the Y chromosome. She explained that the Y chromosome is one of the chromosomes which determines a person's sex, with men possessing an X and Y chromosome and women possessing two X chromosomes. She explained that because Y-STR analysis only examines the Y chromosome it does not result in as unique of a profile as STR analysis, and that because the Y chromosome is passed paternally, a male donor would have the same Y-STR profile as his brothers, father, paternal grandfather, etc.

¶ 20    The results of her analysis were as follows. She analyzed vaginal swabs taken from N.T. as part of the sexual assault evidence kit and no male DNA was detected.

¶ 21    She analyzed two samples taken from a vacuuming of N.T.'s underwear. On one sample she observed a mixture of two DNA profiles. A major DNA profile was observed which matched N.T.'s profile and would be expected to occur in 1 in 5.8 quintillion Caucasians, 1 in 28 sextillion African Americans, or 1 in three sextillion Hispanic unrelated individuals. A second DNA profile was observed that could not be narrowed down to a single profile but was consistent with defendant's profile and would be expected to occur in 1 in 1 in 44 million Caucasians, 1 in 2.2 million African Americans, or 1 in 3.9 million Hispanic unrelated individuals. A Y-STR DNA analysis was likewise performed and revealed a major DNA profile matching defendant's profile, and which was not expected to occur in more than 1 in 8561 male individuals. There was also DNA from two other donors which contained too little information to make a comparison. On the other sample, N.T.'s profile was observed again, as was a second minor profile with too little information to make a comparison. A Y-STR analysis was conducted on the second sample and a profile matching defendant's profile was observed, as was DNA from three other donors with too little information to make a comparison.

¶ 22    She analyzed samples taken from the black hoodie found in the back seat of Jackson's vehicle. Three samples taken from a stain on the sweatshirt were analyzed but did not produce a profile with sufficient information to make a comparison. A sample taken from a vacuuming of the inside cuff of the hoodie was also analyzed, and she observed a major profile matching defendant's profile, and which would be expected to occur in approximately 1in 39 quintillion Caucasians, 1 in 69 quadrillion African Americans, or 1 in 19 quintillion Hispanic unrelated individuals. Three other donors were observed which contained too little information to make a comparison.

¶ 23    She analyzed a sample taken from the exterior door handle of N.T.'s car. There was

insufficient DNA present to analyze, and she performed a Y-STR analysis which revealed a profile at a single locus which was not consistent with defendant's profile.

¶ 24 She also analyzed a sample taken from the interior door handle. That sample revealed two DNA donors which contained too little information to make a comparison. She performed a Y-STR analysis which revealed a mixture from at least two donors. A major profile was observed that could not be narrowed down to a single profile, but was consistent with defendant's profile, and which would not be expected to occur in more than 1 in 1757 male individuals.

¶ 25 She analyzed a sample taken from the interior passenger door panel. A mixture of DNA from two donors was observed which contained too little information to make a comparison. A Y-STR DNA analysis was likewise performed and revealed a major profile matching defendant's profile, and which was not expected to occur in more than 1 in 8561 male individuals. There were also three minor profiles which contained too little information to make a comparison.

¶ 26 She analyzed a sample taken from the gun barrel, but the sample did not reveal an analyzable result.

¶ 27 A sample taken from the grip of the firearm revealed three DNA donors. She observed a first major profile that could not be narrowed down to a single profile, but was consistent with defendant's profile, and would be expected to occur in 1 in 130 trillion Caucasians, 1 in 21 trillion African Americans, or 1 in 120 trillion Hispanic unrelated individuals. A second major profile was observed that could not be narrowed down to a single profile but was consistent with N.T.'s profile and would be expected to occur in 1 in 68 trillion Caucasians, 1 in 550 trillion African Americans, or 1 in 5.4 quadrillion Hispanic unrelated individuals. A minor profile was also observed that could not be narrowed down to a single profile but was consistent with Jackson's profile which would be expected to occur in expected to occur in approximately 1 in four Caucasians, 1 in two African

Americans, or 1 in six Hispanic unrelated individuals.

¶ 28    She also tested a swabbing taken from a stain on the grip of the firearm. A major profile was observed that could not be narrowed down to a single profile but was consistent with N.T.'s profile and would be expected to occur in 1 in 10 quadrillion Caucasians, 1 in 19 quintillion African Americans, or 1 in 2.4 quintillion Hispanic unrelated individuals. Two minor donors were detected but contained too little information to make a comparison.

¶ 29    After this court affirmed defendant's sentence, defendant filed a postconviction petition on March 10, 2020. In his petition defendant argued that appellate counsel was ineffective for failing to raise numerous which we outline further below. The trial court dismissed defendant's petition on May 5, 2020. Defendant was granted leave to file a late notice of appeal.

¶ 30                               II. ANALYSIS

¶ 31    At issue in this appeal is whether the summary dismissal of defendant's petition was proper. "The purpose of a post-conviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that have not been, and could not have been, adjudicated previously upon direct appeal." *People v. Morgan*, 187 Ill. 2d 500, 528 (1999). "The Act is not a substitute for an appeal, but rather, is a collateral attack on a final judgment." *People v. Edwards*, 2012 IL 111711, ¶ 21. A postconviction proceeding has three stages. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). At the first stage, the trial court must determine whether "the petition is frivolous or patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2020). "A postconviction petition is considered frivolous or patently without merit only if the allegations in the petition, taken as true and liberally construed, fail to present the gist of a constitutional claim." *Edwards*, 197 Ill. 2d at 244(Internal quotation marks omitted.)

¶ 32    The standard to survive the first stage is a low threshold, and a defendant need only present a limited amount of detail and need not include legal arguments or legal authority. *Id.* While postconviction petitions should be construed liberally, the court is not required to distort reality and petitions which rely on indisputably meritless legal theories or fanciful factual allegations may be dismissed. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009); *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 48. The dismissal of a first stage postconviction petition is reviewed *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 33    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was objectively unreasonable and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Johnson*, 2013 IL App (2d) 110535, ¶¶ 41, 57. Put another way, "a defendant must show both that counsel's representation was deficient and that the asserted deficiency in counsel's performance prejudiced the defendant." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). At the first stage of postconviction proceedings, a defendant must make a showing that counsel's performance arguably fell below an objective standard of reasonableness and that the defendant was arguably prejudiced by the deficient performance. *People v. Hatter*, 2021 IL 125981, ¶ 24.

¶ 34                              A. N.T.'s Identification of the Firearm

¶ 35    Defendant argues that appellate counsel was ineffective for failing to raise issues regarding N.T.'s identification of the firearm recovered by police as the firearm used by defendant. Defendant maintains that N.T. had described the firearm as a gray revolver and at a previous deposition had described the gun as having a spinning chamber. Yet, the photograph of the gun that N.T. identified as the one used by defendant was a semi-automatic weapon. Further, defendant

argues that there was no evidence that N.T. saw a firearm during the sexual assault, or that defendant was armed during the assault.

¶ 36    The State argues that there was sufficient evidence to find that a firearm was used during the commission of the sexual assault. While N.T. did not see the firearm in the apartment she saw the defendant with the gun in the car, and there is nowhere else he could have gotten a gun if he did not have it with him during the assault. Further, it is not necessary for the victim to see the firearm during the commission of the offense. *People v. Lee*, 376 Ill. App. 3d 951, 956 (2007). With regard to N.T.'s description of the firearm, the State argues that it is the role of the trial court to determine credibility, and it found her identification credible. The State maintains that N.T. unequivocally testified that the defendant had a firearm in his possession, and that alone is sufficient evidence. The State argues that coupled with N.T.'s testimony and defendant's DNA profile being present on the firearm, appellate counsel was not ineffective for not raising the issue.

¶ 37    Witness credibility is an issue regarding the sufficiency of the evidence. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The trial court is in a superior position to weigh the credibility of a witness and resolve conflicts in their testimony. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Therefore, a trial court's credibility determination will be upheld unless "the only inference reasonably drawn from flaws in the testimony is disbelief of the whole." *People v. Cunningham*, 212 Ill. 2d 274, 284 (2004).

¶ 38    Under the totality of the circumstances, it was not unreasonable for the trial court to have found N.T.'s identification of the firearm recovered from Jackson's vehicle as the one displayed by her assailant to be credible. N.T. positively identified the gun at trial. The DNA evidence showed that profiles consistent with both her DNA and defendant's were found on the gun. The gun was found in a location in Jackson's vehicle that defendant had access to, under a hoodie

which had on it a DNA profile consistent with the defendant, one day after the crime was committed, and while defendant was leaving the area where N.T. last saw him.

¶ 39    The only evidence against the firearm identified by N.T. being the one used during the assault was N.T.'s initial description of the firearm as a revolver. At trial and on appeal defendant has done his best to portray N.T. as someone particularly familiar with firearms in order to impart greater weight to her initial identification of the gun used as a revolver. However, the evidence indicated that N.T. possessed a FOID card, "had taken a course on guns," and had recently been to the shooting range. Even if N.T. were familiar with the precise nomenclature of firearms, that does not exclude the possibility that she might use terms like "revolver," "pistol," and "handgun" interchangeably in conversation.

¶ 40    In light of the evidence supporting N.T.'s identification of the firearm, we cannot say that the trial court's determination that N.T.'s identification was credible was unreasonable. Given the sufficiency of the evidence at trial, there was no reasonable likelihood that an appeal on the issue would have been successful. As such, the trial court did not err in dismissing the petition as patently without merit.

¶ 41    As for the argument that there was no evidence that defendant was armed during the sexual assault, we agree with the reasoning of the trial court. From the moment N.T. was awoken to the time she saw defendant with the firearm in her car, defendant did not leave her. There was nowhere defendant could have produced a firearm from other than his person. It is therefore reasonable to conclude that defendant was in possession of the firearm during the assault. As to the fact that N.T. did not see the firearm during the assault, there is no requirement that a defendant brandish or use the firearm, merely that they be "armed with a firearm[.]" 720 ILCS 5/11-1.30(a)(8) (West 2014); see *People v. Sanderson*, 2016 IL App (1st) 141381, ¶ 8 ("[A] person can be guilty of armed

violence when committing a felony while armed with a firearm even if he does not display or intend to use it.").

¶ 42                                B. Prior Consistent Statement

¶ 43    Defendant argues that appellate counsel was ineffective for failing to raise the issue that Detective Padilla's testimony, that N.T. identified the firearm recovered by the police as the one used in the sexual assault, was an inadmissible prior consistent statement.

¶ 44    The State argues that even if it was error to admit Padilla's statement, the testimony at issue consists of a single question and answer regarding N.T.'s identification of the firearm in the photograph and was cumulative of N.T.'s testimony identifying the weapon. Therefore, there was no prejudice, and without prejudice, there can be no ineffective assistance of counsel.

¶ 45    "In general, proof of a prior consistent statement made by a witness is inadmissible hearsay, which may not be used to bolster a witness's testimony." *People v. House*, 377 Ill. App. 3d 9, 19 (2007). The improper admission of a prior consistent statement will warrant reversal of a defendant's conviction only when a reasonable probability exists that the defendant would have been acquitted in the absence of the improperly admitted prior consistent statement. *People v. Stull*, 2014 IL App (4th) 120704, ¶ 106.

¶ 46    Padilla's testimony regarding N.T.'s prior identification of the firearm constituted a prior consistent statement, and therefore should not have been admitted. However, as discussed *supra*, there was ample evidence to support N.T.'s identification of the firearm, and there is no reasonable probability that the outcome of defendant's trial would have been different without that testimony. Therefore, defendant's argument as to this point is patently without merit.

¶ 47                C. Sufficiency of the Evidence for Aggravated Sexual Assault

¶ 48    Defendant argues appellate counsel was ineffective for failing to raise the argument that there was insufficient evidence that N.T. was penetrated by a penis.[1] Defendant argues that N.T. testified on direct that defendant "inserted into [her] body" without specifying that what was inserted, and that immediately prior had mentioned defendant's flashlight. Therefore N.T. could have been referring to the flashlight. When asked whether she was confident that it was a penis inside her she said, "I assume it was." Defendant also maintains that the physical evidence was more consistent with the use of an object, rather than a penis, as the DNA test of N.T.'s vaginal swabs did not disclose any male DNA.

¶ 49    In response the State argues as follows. N.T. did testify that the defendant inserted his penis into her vagina. This testimony was corroborated by the Cardone, who testified that N.T. told her the assailant had penetrated her with his penis. Additionally, the vaginal lacerations were consistent with penile penetration. Further, as the trial court stated, aggravated sexual assault does not require the victim to see penetration. The trial court found her testimony credible. With regard to the lack of male DNA being found in the vaginal swabs, there was dried blood and active bleeding when the swabs were taken, Martinucci testified that blood in the sample could dominate the reaction making it difficult to detect other DNA profiles even if they were present.

¶ 50    Defendant's attempt to characterize N.T.'s testimony as anything other than that defendant penetrated her with his penis misrepresents the testimony. The State almost immediately asked her to clarify her testimony and she positively stated, "He put his penis in my vagina." Regarding

---

[1]Defendant does not explain how this would have changed the outcome as penetration of N.T.'s vagina by an object would still constitute an act of sexual penetration for the purposes of aggravated criminal sexual assault. See 720 ILCS 5/11-0.1 (West 2014).

Cardone's testimony, she testified that N.T.'s injuries were consistent with forcible penetration by a penis and could also be consistent with penetration by an object. Likewise, the DNA expert testified that the presence of blood in the vaginal swabs could well have masked the presence of other DNA. Additionally, N.T. testified that her assailant held both her arms down while he assaulted her. The large and visible bruises on her arms corroborate this testimony, and based on the placement of those bruises it would have been necessary for her assailant to use both hands to hold her arms down. Therefore, it would have been impossible or at minimum extremely difficult for the defendant to have used anything other than his penis in the assault. Additionally, defendant had tried to obtain condoms from the Thorntons immediately prior to the assault.

¶ 51    As the trial court correctly stated, there is no requirement that the victim see a defendant insert their penis in order to be found guilty of aggravated sexual assault. See *People v. Raymond*, 404 Ill. App. 3d 1028, 1042 (2010) (predatory criminal sexual assault of a child conviction upheld despite the fact that testifying witness did not see defendant's penis contact victim's genitals). N.T. testified that she had been married, mothered three children, and during the assault it felt like she was being penetrated by a penis. The evidence that N.T. was penetrated by a penis rather than some other object is more than sufficient and therefore this argument is patently without merit.

¶ 52                              D. DNA Testimony

¶ 53    Defendant argues that there were several flaws with the State's DNA evidence which appellate counsel was ineffective for failing to raise. First, Martinucci had never undergone proficiency testing in Y-STR analysis, which was used to link defendant to virtually every important piece of evidence in this case. Next, Martinucci assumed the presence of two donors when performing certain analyses and should be rejected on that basis.

¶ 54    The State argues that defendant's assertion regarding Martinucci's proficiency in Y-STR analysis is belied by the record. She testified that she receives proficiency testing twice a year and that testing includes Y-STR analysis. With regard to Martinucci's testimony that in her opinion each sample contained at most two donors, she explained the reasoning for her opinion at trial, and defendant points to nothing regarding Martinucci's testimony that indicates she deviated from the standard operating procedures accepted in the scientific community.

¶ 55    To begin, Martinucci testified that she did receive proficiency testing in both STR and Y-STR analysis. Defendant's argument at trial was that the proficiency testing she received for STR analysis included at most two DNA profiles, and the Y-STR tests included only one DNA profile, and that therefore the proficiency tests did not incorporate samples which involved more profiles, as the ones in the instant case did. This is not the same as never having undergone proficiency testing. Accordingly, defendant's argument on that point is without merit.

¶ 56    With regard to defendant's argument that Martinucci made assumptions regarding the number of donors present in a given sample, her testimony made it clear that her determination was based on an examination of the alleles at each loci, and that her determination of how many profiles were present was based upon her consideration of that data. Although she and the questioning attorneys called her determinations an assumption, her determinations were the result of observations of the data, rather than a supposition made without proof.

¶ 57             E. Trial Counsel's Failure to Object to Inadmissible Evidence

¶ 58    Defendant argues that trial counsel was ineffective for failing to object to the admission of certain evidence. Defendant maintains that the testimony regarding apparent blood in the apartment was irrelevant as there was no scientific testimony that the substance was blood. Defendant argues that: testimony regarding N.T.'s ride along was hearsay and a prior consistent

statement and should not have been admitted; N.T.'s identification of the photograph of the gun was suggestive and prejudicial; and N.T.'s testimony that she did not give defendant permission to enter her home was a crude substitute for an in-court identification.

¶ 59    In response, the State argues that defendant's brief fails to set forth an adequate basis as to why the admission of this evidence was improper, nor does it cite to any case law beyond boiler plate regarding ineffective assistance of counsel, and therefore fails to meet the standards set forth by Illinois Supreme Court Rule 341 (eff. Oct. 1, 2020).

¶ 60    "A reviewing court is entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation] and it is not a repository into which an appellant may foist the burden of argument and research [citation]; it is neither the function nor the obligation of this court to act as an advocate or search the record for error [citation]." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). Defendant cites no authority for his assertion that the responding officer's testimony that there were apparent blood stains is irrelevant because no scientific test was performed to determine if the substances were blood. Therefore, this argument is forfeited. Further, we do not see why it would be necessary to perform a test to determine that the stains were blood. N.T. was actively bleeding when the police arrived at her apartment. Further, the blood stains were relevant as they corroborated N.T.'s testimony, and also were probative as to the issue of bodily harm.

¶ 61    With regard to the evidence of the ride along, the video was admitted without audio, and without testimony as to any statements N.T. made during the ride along. In ruling on defendant's motion for a new trial, the court indicated that it gave little or no weight to the ride along, giving no weight to it as a prior consistent statement, or to the arguments based on it. The court was interested in it to the extent that the video showed where she dropped defendant off. The admission

of evidence is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Gill v. Foster*, 157 Ill. 2d 304, 312-13 (1993). The trial court clearly admitted and considered the ride along video as a visual aid to N.T.'s testimony, rather than as a prior consistent statement bolstering her testimony. Accordingly, defendant's argument as to this point is patently without merit.

¶ 62    We have discussed N.T.'s prior identification of the firearm recovered from Jackson's vehicle *supra*. While the prior identification was an improper prior consistent statement, the error was harmless, and therefore this argument is patently without merit.

¶ 63    As to N.T.'s testimony that she did not give the defendant permission to enter her apartment, we disagree with defendant that this was a crude attempt to substitute for an in-court identification of the defendant. Home invasion requires a defendant to knowingly enter the dwelling place of another "without authority" to do so. 720 ILCS 5/19-6 (West 2014). Her testimony was directed towards defendant's home invasion charge.

¶ 64                    F. Trial Counsel's Failure to Challenge DNA Evidence

¶ 65    Defendant argues that appellate counsel was ineffective for failing to seek a forensic analysis of the bank receipt and dollar bills. He additionally argues that defense counsel was incompetent for failing to hire an expert to rebut the DNA evidence.

¶ 66    In response, the State argues that defendant's argument regarding the testing of the receipt and bills is speculative and the lack of supporting documentation is fatal to his claim. There is nothing to indicate that testing the receipt and bills would have resulted in exculpatory evidence, and a claim for ineffective assistance of counsel must show that the result of the proceedings would have been different had the evidence been presented. The State further argues that trial counsel's strategy was to show that relying on Martinucci's testimony was improper as the calculations were

based on assumptions, and that calling another expert would have instead turned the case into a battle of the experts.

¶ 67 In support of his argument, defendant cites to several cases for the general proposition that counsel can be ineffective for failing to obtain forensic testing of evidence or failing to obtain expert testimony. However, defendant fails to support his argument as to why counsel's failure to retain an expert or test the receipt and bills was ineffective in this particular case. To survive dismissal at the first stage of proceedings a postconviction petition alleging ineffective assistance of counsel must provide an arguable basis for both prongs of the *Strickland* test. *People v. Rademacher*, 2016 IL App (3d) 130881, ¶ 52. The prejudice prong will not be satisfied based on mere conjecture or speculation as to outcome. *People v. Palmer*, 162 Ill. 2d 465, 481 (1994). Defendant fails to provide an arguable basis that had trial counsel tested the bills and receipt, the outcome of the trial would have been different.

¶ 68 Defendant's argument on appeal amounts to an argument that the bills and receipt were relevant evidence, and had the results of the testing been inculpatory, trial counsel need not have disclosed those results. Defendant does not even explain what results would have been beneficial to him or how those results would disprove the other DNA evidence against him. Regarding the hiring of an expert, defendant merely argues that an expert could have testified as to the flaws in Martinucci's testimony, and states defendant was prejudiced.

¶ 69 Defendant has failed to set forth an arguable basis that he received ineffective assistance of appellate counsel, and therefore the trial court did not err in determining that his argument is patently without merit.

¶ 70                                    III. CONCLUSION

¶ 71 For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 72    Affirmed.