2025 IL App (1st) 231183-U
Order filed: January 16, 2025

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1183

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 20 CR 07045 |
| | ) | |
| JOSEPH GIZEL, | ) | Honorable |
| | ) | Mark W. Martin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court erred by accepting defendant's jury waiver and allowing him to represent himself *pro se*. We vacated defendant's convictions and sentence for predatory criminal sexual assault and criminal sexual assault and remanded for a new trial at which he will be represented by counsel.

¶ 2    Following a bench trial, the court convicted defendant, Joseph Gizel, of five counts of predatory criminal sexual assault and four counts of criminal sexual assault against his minor daughter, J.G. The court merged the criminal sexual assault counts into the predatory criminal sexual assault counts and sentenced defendant to 75 years' imprisonment. On appeal, defendant argues that the trial court erred by allowing him to represent himself at trial. We vacate defendant's convictions and sentence and remand for a new trial at which he will be represented by counsel.

¶ 3    Defendant was arraigned on August 18, 2020, and pleaded not guilty. At the time, he was represented by a public defender. At a hearing on November 13, 2020, defendant told the court he wanted to represent himself. The court warned defendant that he would be making a "huge mistake" in representing himself, as he lacked the requisite legal training and courtroom experience. The court noted the seriousness of the charges and the necessity that defendant be represented by an experienced attorney familiar with the rules of evidence and courtroom procedure. The court told defendant that it would give him two weeks to rethink his decision and it continued the case to December 9, 2020.

¶ 4    On December 9, defendant stated that he still wanted to represent himself. The court admonished defendant pursuant to Supreme Court Rule 401(a) (eff. July 1, 1984) of the nature of the charges against him, the minimum and maximum sentences, and his right to counsel. The court again emphasized the seriousness of the charges and the potential of a natural life sentence and told defendant that he would be making a "tragic and huge mistake" to represent himself against an experienced state's attorney. Defendant said he understood the Rule 401 admonishments, but that he still wished to proceed *pro se*. The court stated that it would accept defendant's waiver of counsel.

¶ 5    On March 17, 2021, the court held a hearing during which the State moved to consume DNA evidence on a vibrator that defendant allegedly used on J.G. The State intended to compare the DNA recovered from the vibrator to DNA from swabs taken from J.G. The court asked defendant for a response and he replied, "I don't know what to say." The court told defendant that he needed to be represented by an experienced attorney and that he was making a mistake by representing himself.  Defendant said, "I understand, your Honor. I just need time to get things done and everything and then understand more, but I understand." The court stated that it needed

a response from defendant to the State's motion to consume DNA from the vibrator. Defendant replied, "Can I deny right now? I want to say no. I mean, I—I want to look into—more into it." The court continued the cause to March 29.

¶ 6        At the hearing on March 29, 2021, defendant expressed confusion about the nature of the State's motion. Defendant thought that the State was requesting to extract DNA from him. The court informed defendant that the State already had his DNA and was requesting to consume DNA from the vibrator. Defendant asked for a continuance. The court told defendant that the case already had been continued to March 29 for the express purpose of giving him time to formulate his response. Defendant said, "I object. I deny. I don't agree. I mean, what else am I supposed to say, your Honor?" The court granted the State's motion.

¶ 7        On April 23, 2021, the parties appeared before the court to set a date for defendant to review discovery. The court again recommended that defendant agree to the appointment of the public defender. Defendant refused, stating that he felt "safer" representing himself. The cause was continued to June 25.

¶ 8        On June 25, 2021, defendant again informed the court that he intended to represent himself. The court asked defendant his age, educational background, work experience, and criminal history. Defendant responded that he was 47 years old, had graduated high school, worked as a mover for 15 years, and previously served time for aggravated battery. The court again gave defendant Rule 401(a) admonishments and warned him that he was facing a potential life sentence and that he should allow the public defender to represent him. Defendant stated that it would be in his "best interest" to represent himself. The State informed the court that it had tendered a significant amount of discovery to defendant and they were awaiting DNA test results. The State asked for a date to show defendant the video of J.G.'s interview with a forensic investigator and to file a section 115-

10 (725 ILCS 5/115-10 (West 2020)) motion for the admission of hearsay evidence and a section 115-7.3 (725 ILCS 5/115-7.3 (West 2020)) motion for the admission of evidence of other sexual offenses committed by defendant against his other daughter, A.G. The court continued the cause to July 28.

¶ 9    On July 28, 2021, the State was granted leave to file its section 115-7.3. motion to admit evidence of defendant's other sex crimes committed against A.G. to show propensity. The motion stated that defendant had forced A.G. to engage in oral, vaginal, and anal sex from the ages 9 to 15 and had similarly forced J.G. to perform the same acts from ages 8 to 12. The motion further asserted that defendant forced J.G. and A.G. to engage in threesomes with him on multiple occasions. He used sex toys on both girls and purchased lingerie for them to wear.

¶ 10    After the State filed the section 115-7.3 motion, the court continued the cause to September 2 for defendant to file a response and for the State to also file its section 115-10 motion.

¶ 11    On September 2, 2021, the court asked defendant if he had filed a response to the section 115-7.3 motion and he said no. The court asked defendant if he intended to file a response, and defendant responded, "I'm not sure, your Honor. No." The State asked for a new date to file its section 115-10 motion. The court continued the cause to October 6.

¶ 12    On October 6, 2021, the State filed its section 115-10 motion, seeking the introduction of J.G.'s hearsay statements to her mother and to the forensic investigator. The court asked defendant if he had filed a response to the State's previously filed section 115-7.3 motion, and he responded no. The court said, "You should do that." Defendant responded, "Yes, your Honor." The court told defendant to file his response to the section 115-7.3 motion by October 27.

¶ 13    On October 27, 2021, the State tendered defendant copies of the section 115-7.3 and 115-10 motions and the DNA results from the vibrator. The court asked defendant if he wanted to look

over the section 115-7.3 motion and file a response. Defendant answered affirmatively. The court also informed defendant that it would set a date for a hearing on the section 115-10 motion after defendant reviewed the discovery that had been tendered to him. The cause was continued to December 1.

¶ 14 On December 1, 2021, defendant again informed the court that he wished to represent himself. The court asked defendant about his criminal history, and defendant stated he had never before been convicted of a crime (which was contrary to his statement on June 25, 2021, that he had been convicted of aggravated battery). The court again gave defendant the Rule 401(a) admonishments and warned that he was making a huge mistake by attempting to represent himself, given his unfamiliarity with legal procedures and the rules of evidence. Defendant reiterated that he wished to proceed *pro se*. The court said that if the case goes to trial, stand-by counsel would not be appointed to represent him. Defendant said he understood. The cause was continued to January 27.

¶ 15 On January 27, 2022, the State informed the court that discovery was complete. The State also told the court that it had attempted to show defendant videos of the forensic interviews with J.G. and A.G., but that he had refused to watch them. The State also said that defendant had not filed any responses to the section 115-7.3 and 115-10 motions. The court asked defendant if he had refused to watch the forensic videos, and he said yes. The court asked defendant if he had filed a written response to the State's motions, and he responded, "not yet." The court asked why, and defendant said, "I'm catching up on everything and I got a lot going on and I'll catch up on it."

¶ 16 On March 30, 2022, the parties appeared for the hearings on the State's section 115-7.3 and 115-10 motions. The court asked defendant whether he had filed any responses to the motions, and defendant said no. The court stated that it would first conduct a hearing on the section 115-7.3

motion and it again asked defendant whether he had prepared a written response to the motion. Defendant replied, "No, your Honor. I wasn't prepared. I don't have those things." The court told the State to present the motion.

¶ 17    The State argued for the admission of the evidence of defendant's sexual abuse of A.G. to show his propensity to commit sex crimes and to show his motive and intent. After the State finished its argument, the court asked defendant for his response. Defendant stated, "That's all arguable. It's all hearsay, and I don't know where they got this and that from; but I am unprepared at the moment to mention anything further." The court then granted the State's section 115-7.3 motion. The hearing on the section 115-10 motion was continued to May 17, 2022.

¶ 18    On May 17, the State informed the judge that it was amending the section 115-10 motion, seeking only to have the video of the forensic interview with J.G. admitted and not J.G.'s statements to her mother. The court asked defendant whether he was ready to proceed. Defendant responded, "Your Honor, I was told it was continued to December 18th, and I would want to ask for a three-week continuance. I'm not ready." The State responded that the hearing was set for May 17 (not December 18) and asked that the motion for a continuance be denied. The court asked defendant why he was not ready. Defendant replied, "I wasn't feeling well for the past couple weeks and I'm a little bit behind. I'm just asking for three weeks." The court denied defendant's motion for a continuance and told the State to call its witness.

¶ 19    The State called Guadalupe Salgado, who testified that she formerly worked as a forensic interviewer for the Children's Advocacy Center and conducted an interview with J.G. on June 26, 2020. Salgado identified People's Exhibit 1 as the video of the interview. The State asked to publish the video. The court asked defendant whether he had any objections. Defendant responded, "Again, I'm just not ready, your Honor. I want a continuance so I can be ready more." The court

asked defendant whether he wanted to ask Salgado any questions prior to the viewing of the video, and he replied, "I'm not ready. I have so much to dispute about it, but I'm not ready." The State informed the court that defendant had been given the opportunity to view the video on December 16 and refused. Defendant responded, "I did refuse it and with good reason, and I will be ready in good time. The defendant needs time. I am just not ready now. I did refuse it and I don't need to see it. I didn't do it but I'm going to prove it." The court then viewed the video.

¶ 20    The video depicts Salgado and J.G. sitting in a room, speaking with each other. Salgado asks J.G. to describe what defendant did to her. J.G. states that beginning when she was eight years old, defendant forced her to do "sexual things." J.G. later specifies that defendant forced her to engage in vaginal and anal sex, and to perform oral sex on him. At least three times, defendant forced her to engage in a threesome with A.G. He also showed her pornography, made her wear lingerie, and once inserted a glittery, pink vibrator into her vagina. If she resisted, defendant would get angry and yell at her and grab her arms. J.G. had been scared to tell anyone of the abuse because defendant was a very large man with a temper; sometimes he would punch the walls of his house when angry. Defendant last abused her in March 2020.

¶ 21    After the video was played, the State rested. The court asked defendant whether he wanted to present any evidence in opposition to the State's motion and he said no. The State then argued for admission of the video at trial, arguing that the time, content and circumstances of J.G.'s statements during the interview provide sufficient safeguards of reliability. Following the State's argument, the court asked defendant for a response. Defendant stated he was "not prepared to do this at the moment." The court granted the State's section 115-10 motion.

¶ 22    The State asked to set the case for trial. The court explained to defendant the difference between a jury trial and a bench trial. Defendant requested a bench trial and signed a jury waiver.

The court asked defendant if he intended to call any witnesses and he said yes. The court then asked how many witnesses he intended to call and defendant said he was unsure because he was "having a hard time getting ahold of people." The State asked that defendant give it a list of witnesses. The court told defendant that it would give him one month to send a letter to the State containing a list of his witnesses. The court continued the cause to July 5 for defendant to file his answer and to provide the State with his witness list.

¶ 23    On July 5, 2022, the parties appeared and the court asked defendant whether he had filed his answer and witness list. Defendant said no, explaining, "I have a good reason. I've been moved five times in the past four weeks. I got moved to Cermak, which is the medical unit, because I don't come out of my cell. I remain in my cell."

¶ 24    The court responded that defendant had been given sufficient time to submit his answer, provide the witness list, and make any pretrial motions. The court set the case for trial on October 18, 2022.

¶ 25    On October 18, the State sought a continuance because one of its witnesses was unavailable. The court questioned whether a behavioral clinical exam (BCX) ever had been performed on defendant. Defendant stated he had never been interviewed by forensic clinical services. The court continued the cause to November 2 for a status hearing and further discussion of whether to order a BCX for defendant.

¶ 26    On November 2, 2022, the court conducted the status hearing and stated that it had a *bona fide* doubt of defendant's fitness. The court ordered that defendant undergo a fitness examination by forensic clinical services. The cause was continued to December 14, 2022.

¶ 27    On December 14, the court stated that it had received a letter filed that day from Doctor Philip Pan, a psychiatrist with forensic clinical services who had examined defendant on

November 21, 2022 and December 13, 2022. In the letter, Dr. Pan stated that he diagnosed defendant with unspecified schizophrenia spectrum and other psychotic disorder. Dr. Pan noted that defendant "evidences some very odd if not bizarre behaviors, such as not showering and his appearance during the interviews. He exhibits some idiosyncratic and disorganized thinking, as well as restricted affect." Due to defendant's "delusional thinking," he had been prescribed antipsychotic medication but he is not receiving medication at this time.

¶ 28    Dr. Pan concluded that defendant was fit to stand trial because he "currently demonstrates an adequate understanding of the nature and purpose of the proceedings against him. He is able to assist counsel in his defense." However, Dr Pan concluded that defendant was unfit to represent himself *pro se* as he is "unable to mount a defense solely on his own due to disorganized and paranoid thinking."

¶ 29    The court ordered a fitness hearing, which was held on March 14, 2023. Dr. Pan was the only witness and the court conducted the examination. Dr. Pan testified that he interviewed defendant twice, on November 21 and December 13, and concluded that defendant suffered from unspecified schizophrenia spectrum and other psychotic disorder. When asked the symptoms of this disorder, Dr Pan testified, "Well, he's got some very odd behaviors. He's had a lot of problems with his hygiene at the jail and not showering. There is some *** idiosyncratic and disorganized thinking. And I'm concerned about some paranoid delusional thinking." Defendant had been prescribed antipsychotic medication but refused to take it. The medication was discontinued. Dr. Pan determined that defendant was fit to stand trial even without medications because his answers to the interview questions indicated his understanding of the charges against him and how a trial works.

¶ 30    Dr. Pan testified that there is a series of questions forensic clinical services use to determine the ability of a defendant to represent himself, including whether he knows how to file a motion, make an opening statement and closing argument, and issue a subpoena. Defendant expressed uncertainty as to how to perform any of those functions.

¶ 31    Dr. Pan concluded that while defendant was fit to stand trial with counsel, he was not fit to represent himself. Dr. Pan explained:

"[B]asically, Mr. Gizel insists that the allegations are false and he's being set up by his [ex-wife]. He cited he has many witnesses on his behalf, but he wouldn't elaborate or share with me who those people are. He expressed a lot of focus that the charges would be dropped but didn't really give me any explanation or logic why they would be. *** He was adamant that *** one of the victims must have dropped the charges by now. And some of his logic for why his ex-wife was persecuting him just seemed very bizarre and faulty."

¶ 32    The court questioned Dr. Pan as to the severity of defendant's mental illness. Dr. Pan testified that the symptoms of defendant's mental illness were not so severe as to affect his ability to stand trial, but Dr. Pan concluded that the illness caused defendant to be so disorganized as to render him incapable of representing himself. The court followed up by asking Dr. Pan, "So is it your conclusion that he is not suffering from severe mental illness?" Dr. Pan responded, "Yes." The court asked the parties whether they wished to question Dr. Pan. Both the State and defendant said no. The court admitted Dr. Pan's psychiatric report into evidence. The report largely mirrored Dr. Pan's testimony at the hearing.

¶ 33    On May 8, 2023, the trial court first found defendant fit to stand trial based on Dr. Pan's testimony and report that defendant understood the nature of the proceedings against him and was able to assist counsel in his defense. Turing to the issue of whether defendant was fit to represent

himself and conduct trial proceedings on his own, the trial court stated that in *Godinez v. Moran*, 509 U.S. 389 (1993), the Supreme Court held that "the standard for fitness to stand trial and represent one's self are the same." Accordingly, the trial court determined that as Dr. Pan found that defendant was fit to stand trial with counsel, "[t]his finding potentially ends the matter with respect to the question whether the defendant is fit to represent himself [under] *Godinez*."

¶ 34 The trial court then cited the Supreme Court's holding in *Indiana v. Edwards*, 554 U.S. 164 (2008), that the state court may deny a defendant's request to represent himself during trial where he suffers from a "severe" mental illness rendering him incompetent to conduct trial proceedings by himself and that trial judges are in the best position to make this assessment. Before making a final ruling on the issue of whether defendant was competent to represent himself at trial here, the trial court carefully admonished defendant pursuant to Rule 401(a) and in doing so described each of the counts against defendant, the possible penalties, and his right to be represented and have an attorney appointed. Defendant stated that he understood and wished to waive his right to counsel.

¶ 35 The trial court then returned to the issue of whether defendant was competent to waive his right to counsel and conduct trial proceedings on his own. The court again found that under *Godinez*, the competence to stand trial and the competence to waive counsel are determined under the same standard, meaning that since Dr. Pan found defendant competent to stand trial, he necessarily was competent to waive counsel and proceed *pro se* during trial. The court further determined that under *Edwards*, the defendant may be found incompetent to waive counsel only if he is suffering from a "severe" mental illness. Noting Dr. Pan's testimony that defendant's mental illness was not severe, the court ruled that defendant was mentally competent to represent himself at trial and therefore it accepted his waiver of counsel.

¶ 36    The bench trial commenced on May 9, 2023. The State gave an opening statement recounting how the evidence would show that defendant forced J.G. to engage in vaginal, anal, and oral sex from ages 8 to 13. Defendant gave a rambling opening statement focusing on his unhappy marriage. He did not directly address the sexual assault charges against him or indicate what he expected the evidence to show.

¶ 37    The State called J.G., who testified she was 15 years old and that her date of birth was May 17, 2007. J.G. testified that when she was eight or nine years old, defendant called her into his bedroom and asked her to perform a threesome with him and her sister, A.G. She remembers sucking on defendant's fingers on that occasion, but otherwise cannot remember what else occurred. For years afterward, defendant regularly forced J.G. to perform oral sex on him and to engage in vaginal and anal sex. This usually occurred in defendant's bedroom, but also sometimes in a closet or in the garage. Defendant also required J.G. to wear lingerie and rub his penis with her hands and he put a vibrator in her vagina and showed her pornography. J.G.'s mom was a flight attendant who was not at home on the many occasions when this sexual abuse occurred. J.G. was scared to tell anyone about the sexual abuse because she was fearful that defendant would hurt her and that no one would believe her.

¶ 38    The State showed J.G. several photographs, which she identified as depicting the lingerie defendant forced her to wear and the vibrator he used on her. The State offered the photographs into evidence without any objection from defendant. The court admitted the photographs.

¶ 39    J.G. testified that that in May 2020, when she was 13, her mom asked her whether defendant was abusing her and she said yes. On June 25, 2020, J.G. went to the hospital where an exam was performed on her. On June 26, J.G.'s mom took her to the Child Advocacy Center, where she spoke with a forensic investigator.

¶ 40    During cross-examination, defendant initially asked J.G. when the sexual acts allegedly occurred, and she said day and night. He then asked J.G. a series of vague, compound questions regarding her day-to-day life with him. Objections were sustained to all these questions. Eventually, defendant elicited testimony from J.G. that sometimes he played ball with her and took her to the movies and the swimming pool and dropped her off at sleepovers and intervened to stop her siblings from teasing her too much. Defendant did not ask J.G. any other questions regarding her testimony on direct examination that he had sexually abused her for years.

¶ 41    The State called Jun Akaishi, who testified she is defendant's ex-wife. They had four children together, J.G. and A.G and two sons. During their marriage, Akaishi worked as a flight attendant while defendant stayed home with the children. In May 2020, A.G. told her about how defendant had been sexually abusing her. Akaishi then spoke with J.G., who told her that she also had been sexually abused by defendant.  On June 25, 2020, Akaishi went to the police and then took A.G. and J.G. to the hospital for an examination. The next day, Akaishi took them to the Child Advocacy Center for forensic interviews. On July 6, 2020, Akaishi discovered a lockbox in her home containing a pink vibrator. She called the police, and they came to the house and collected the lockbox and took buccal swabs of her, J.G., and A.G.

¶ 42    During cross-examination, defendant elicited testimony from Akaishi that during their marriage, she sometimes agreed to his having sex with other women. However, she testified that she never intended for him to engage in sexual acts with their children. Akaishi further testified that since she made more money than defendant, she requested that he quit his job to stay home with the children while she continued to work. When asked to characterize their relationship, Akaishi testified that it was a "love and hate relationship." Sometimes she wore lingerie for him. Defendant did not ask her any questions about his alleged sexual abuse of J.G. and A.G.

¶ 43    On redirect-examination, Akaishi testified that she did not wear the lingerie that was found in defendant's lockbox.

¶ 44    The State called A.G. as an other-crimes witness. A.G. testified that she was 18 years old and her date of birth was July 9, 2004. The sexual abuse from defendant began when she was nine years old. Defendant asked her to touch his penis over his clothes with her hand. Subsequently, continuing for several years, defendant forced her to rub his bare penis with her hands and to engage in oral, anal, and vaginal sex. These acts usually happened in his bedroom. Defendant also put sex toys in her vagina and required her to wear a school-girl costume with stockings. He showed her pornography. Sometimes defendant would engage in a threesome with A.G and J.G., during which he would force them to perform oral sex on him and/or on each other. The State showed A.G. photographs, which she identified as depicting the school-girl costume, sex toy, and lock box. She also identified photographs from defendant's phone focusing on her cleavage. The State sought to admit the photographs from defendant's phone into evidence. When asked if he had any objections, defendant stated, "I'll just defend myself against them, your Honor." The photographs were admitted.

¶ 45    A.G. testified that in May 2020, she told her mom about defendant's abuse. On June 25, 2020, she went to the hospital for an examination. On June 26, she had a forensic interview at the Child Advocacy Center.

¶ 46    On cross-examination, defendant asked A.G. whether she had taken the photographs of herself on his phone and she said no. Defendant elicited testimony from A.G. that he had taken her to the pool as a child and taught her how to play softball. Defendant asked A.G. whether he had allowed her to go on sleepovers. She replied, "Yes, but on conditions." When asked what conditions, A.G. testified, "That I would have sex with you before."

¶ 47    The State called Detective Frank Moreno, who testified that defendant was arrested on June 25, 2020, and consented to a search of his phone. Moreno discovered videos of sex acts. The videos depicted the participants' bodies but not their faces and therefore Moreno could not discern their identities. Moreno also discovered photographs of A.G. focusing on her cleavage. On July 7, Akaishi called him to say that she had discovered defendant's lockbox in the closet of the master bedroom. The lockbox contained a pink vibrator, school-girl uniform, and lingerie. Defendant did not cross-examine Moreno.

¶ 48    The State called Le'Kai Adams, a forensic scientist with the Illinois State Police. Adams was tendered as an expert in the field of forensic biology and DNA analysis. Defendant made no objection. Adams testified that she tested DNA found on the pink vibrator and found a match with J.G.'s DNA.

¶ 49    The State called Guadalupe Salgado, who identified People's Exhibit 21 as the video of her interview with J.G. on June 26, 2020. The State sought to publish the interview. Defendant made no objection. The video was played for the court. Defendant did not cross-examine Salgado.

¶ 50    The State rested its case. The court asked defendant whether he had any motions. Defendant asked, "Motions as far as what, your Honor?" The court explained that it could not advise defendant on the motions to file, although it noted that typically a criminal defendant will file a motion for a directed finding. Defendant stated that he did not have any motions.

¶ 51    The court then asked defendant whether he had any witnesses to call. Defendant responded that there were witnesses he wished to call, but he did not have any of their phone numbers. The court asked defendant if he had issued any subpoenas for witnesses and he said no. The court asked, "So you do not wish to present any defense witness testimony, correct?" Defendant responded, "I do. I'm late on doing it. It was a mistake, your Honor." The trial court asked

defendant whether he had filed an answer to discovery listing the witnesses he wanted to call. Defendant said no. The trial court asked defendant whether he had any physical or documentary evidence, and he said no. The court then explained that defendant had the right to testify as well as the right to remain silent and rely on the State's inability to prove the charges. Defendant stated he did not wish to testify. The court accepted defendant's waiver of the right to testify and asked whether the defense rested. Defendant said yes.

¶ 52    The State gave a closing argument recounting the evidence of defendant's guilt. Defendant made a rambling closing argument in which he accused Akaishi of falsely planting evidence that he had sexually abused his children. The court sustained multiple objections that defendant's argument was not based on the evidence at trial.

¶ 53    The court convicted defendant on all nine counts and set June 7, 2023, for the presentation of posttrial motions and sentencing. On June 7, defendant informed the court that he had not filed any posttrial motions. The cause proceeded to sentencing. The State presented a victim impact statement from Akaishi and argued factors in aggravation. The court asked defendant whether he had any evidence in mitigation, and he responded that he had been unable to contact any witnesses. The court allowed defendant to proffer what the witnesses would say. Defendant asserted that four of his witnesses (his mother, aunt, and two sisters) would testify to his unhappy marriage and that they each offered to talk to Akaishi to "help ease tension in the home." A fifth witness, Salvatore Martirano, also would testify to the "trauma" defendant endured during the marriage.

¶ 54    The court gave defendant the opportunity to present arguments in mitigation. Defendant stated he was a great father and that he did not commit the charged crimes. The court gave defendant the opportunity to make a statement in allocution. Defendant repeated the argument that he was a great father and innocent of the charges. The court sentenced defendant to 75 years'

imprisonment and advised him of his appellate rights and of the need to file a post-sentencing motion within 30 days if he wished to challenge his sentence. The cause was continued to July 5.

¶ 55    On July 5, 2023, the court asked defendant if he had filed a motion to reconsider the sentence, and defendant responded, "Your Honor, I don't even know how to do that." He asked for another week to file the motion, but the court expressed its concern that the motion would be untimely. Defendant was provided with a preprinted motion for new trial and motion to reconsider sentence, which he filled out. The court struck the motion for new trial as untimely and denied the motion to reconsider sentence. Defendant now appeals.

¶ 56    Defendant argues that the trial court should not have permitted him to represent himself *pro se* because he was not mentally competent to do so. Our review is for an abuse of discretion. *People v. McNutt*, 2020 IL App (1st) 173030, ¶ 85. The State argues, and defendant concedes, that he forfeited review by failing to raise this issue in the trial court. Defendant asks us to review his claim under the second prong of the plain error rule. Ill. S. Ct. R.615(a) (eff. Jan. 1, 1967). "This court has consistently held that the right to counsel is so fundamental that we will review as plain error a claim that there was no effective waiver of counsel although the issue was not raised in the trial court." *People v. Herring*, 327 Ill. App. 3d 259, 261 (2002). We therefore address defendant's claim on appeal.

¶ 57    The sixth amendment of the United States Constitution (U.S. Const., amend VI) guarantees criminal defendants the right to proceed without counsel. However, a defendant's waiver of counsel must be knowing, intelligent, and voluntary. *McNutt*, 2020 IL App (1st) 173030, ¶ 78. Supreme Court Rule 401(a) provides that for there to be a knowing, intelligent, and voluntary waiver, defendant must be admonished of the nature of the charges, the minimum and maximum sentences, and the right to counsel. Ill. S. Ct. R. 401(a) (eff. July 1, 1984). We have long held that

when determining whether defendant understands the admonishments, the court considers his age, level of education, mental capacity, and his prior experience with legal proceedings. *People v. Ward*, 208 Ill. App. 3d 1073, 1083 (1991). In the instant case, the trial court gave defendant his Rule 401(a) admonishments several times in the years prior to trial, specifically warning him each time that he would face severe disadvantages during trial if he waived his right to counsel. Defendant repeatedly stated that he understood the admonishments but felt that it would be "safer" for him to proceed *pro se*. No issue is raised on appeal concerning the giving of the Rule 401(a) admonishments or the form of the inquiry. The issue is whether defendant's request to waive counsel should have been denied based on his mental infirmities.

¶ 58    In *Indiana v. Edwards*, 554 U.S. 164 (2008), the United States Supreme Court considered whether there was a "mental-illness-related limitation on the scope" of the right of self-representation. *Id.* at 171. In *Edwards*, a state court found the defendant to be mentally competent to stand trial when represented by counsel, but not mentally competent to represent himself *pro se*, and so it denied his self-representation request. *Id.* at 169. The issue on appeal was whether the Constitution required the state court to allow the defendant to represent himself at trial. *Id.*

¶ 59    The Court noted that prior cases had held that a criminal defendant was competent to stand trial if he had a rational and factual understanding of the proceedings against him and also possessed the capacity to rationally consult with his attorney. *Id.* at 170 (citing *Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*), and *Drope v. Missouri*, 420 U.S. 162 (1975)). However, neither *Dusky* nor *Drope* directly addressed whether it was constitutional for a state to deny the defendant the right to proceed *pro se* and conduct trial proceedings on his own if he was not mentally competent to do so. *Id.* at 170.

¶ 60    The Court further noted that *Godinez v. Moran*, 509 U.S. 389 (1993) was the sole case in which it had considered mental competence and self-representation together. *Edwards*, 554 U.S. at 171. *Godinez* involved a criminal defendant who asked a state trial court to allow him to represent himself and change his pleas from not guilty to guilty. The trial court determined that the defendant met *Dusky*'s mental competence standard and granted his requests to represent himself and change his pleas to guilty. *Godinez*, 509 U.S. at 392-93. The appeals court vacated the defendant's guilty pleas, finding that the Constitution required the trial court to ask whether the defendant was competent to waive his right to counsel, which was a higher mental competency standard than the standard set forth in *Dusky*. *Id.* at 393-94. The Supreme Court reversed the appeals court, rejecting "the notion that competence to plead guilty or to waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard." *Id.* at 398.

¶ 61    *Edwards* concluded that *Godinez* only addressed the defendant's ability to proceed on his own to enter a guilty plea, and did not answer the question whether a state trial court may deny a defendant the right to conduct trial proceedings if not mentally competent to do so. *Edwards*, 554 U.S. at 173. *Edwards* proceeded to address the issue, reasoning:

> "[T]he nature of the problem before us cautions against the use of a single mental competency standard for deciding both (1) whether a defendant who is represented by counsel can proceed to trial and (2) whether a defendant who goes to trial must be permitted to represent himself. Mental illness itself is not a unitary concept. It varies in degree. It can vary over time. It interferes with an individual's functioning at different times in different ways." *Id.* at 175.

¶ 62    The Court noted that a defendant may be mentally competent to stand trial when represented by counsel yet may be unable to perform the "basic tasks" necessary for his defense without the help of counsel. *Id.* at 175-76. The "spectacle" that could result from a mentally incompetent person representing himself could prove humiliating to him and abridge or diminish the dignity underlying his self-representation right. *Id.* at 176. Therefore, the Court held that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178.

¶ 63    The Court did not endorse any particular test for determining whether a mentally ill defendant is competent to stand trial but not so competent as to conduct trial proceedings by himself. However, the Court did favorably reference a portion of the American Psychiatric Association's *amicus* brief, which stated, "[d]isorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, anxiety, and other common symptoms of severe mental illnesses can impair the defendant's ability to play the significantly expanded role required for self-representation even if he can play the lesser role of represented defendant." *Id.* at 176.

¶ 64    In the instant case, our review of the record indicates that the trial court erred by accepting defendant's waiver of counsel because he was not competent to conduct trial proceedings by himself. Dr. Pan explained at the fitness hearing that defendant's unspecified schizophrenia spectrum and other psychotic disorder manifested itself in paranoid, delusional thinking as exhibited by his incorrect belief that the charges had been dropped by one of the victims. He also exhibited disorganized thought processes, manifested by his inability to identify which witnesses he should call in his defense. He expressed uncertainty when asked a series of questions designed to determine his ability to represent himself. Dr. Pan concluded that although defendant was

competent to stand trial when represented by counsel, his mental illness rendered him so disorganized in his thinking as to render him incapable of representing himself at trial.

¶ 65    The trial court discounted Dr. Pan's findings. Relying on *Godinez*, the court found that the competence to stand trial and the competence to waive counsel are the same, meaning that since Dr. Pan had found defendant fit to stand trial with counsel, he necessarily was competent to waive counsel and conduct trial proceedings *pro se*. The trial court's finding runs counter to *Edwards*, which held that *Godinez* only addressed a defendant's ability to appear on his own to enter a guilty plea, and that *Godinez* did *not* address the issue here, *i.e.*, whether a state trial court may deny defendant the right to conduct trial proceedings *pro se* if he is not mentally competent to do so. *Edwards* held that there is no single competency standard for deciding both whether a defendant who is represented by counsel can proceed to trial and whether a defendant who goes to trial must be allowed to represent himself. *Id.* at 175. See also *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 49 (noting that under *Edwards*, "the standard for deciding whether defendant was competent to conduct trial proceedings on his own is not the same standard for whether he was fit to stand trial."). The standard for determining whether defendant is fit to stand trial with counsel requires the court to consider whether he had a rational and factual understanding of the proceedings against him and the capacity to rationally consult with his attorney. *Edwards*, 554 U.S. at 170. Even if defendant possesses such an ability to rationally understand the proceedings and consult with his attorney, he still may be incompetent to conduct trial proceedings on his own if he suffers from a severe mental illness symptomized by disorganized thinking and deficits in sustained attention and concentration that prevent him from performing the basic tasks needed to present his own defense. *Id.* at 176.

¶ 66    Dr. Pan's testimony that defendant's mental illness was manifested by paranoid, delusional, and disorganized thinking preventing him from performing the basic tasks needed to present his own defense was sufficient under *Edwards* to show that defendant was incompetent to represent himself and conduct trial proceedings on his own even though he was fit to stand trial with counsel. Dr. Pan's testimony was not contradicted by any other witness or other medical evidence and in fact was supported by defendant's conduct during pre-trial proceedings and at trial, when he failed to carry out even the most basic tasks needed to present his own defense. Specifically, defendant failed to file any responses or make any coherent arguments against the State's pretrial motions to consume DNA from the pink vibrator and to the section 115-7.3 and 115-10 motions, explaining that he was unprepared even though he had been granted continuances for eight months to prepare for the motions. Defendant failed to file an answer or a witness list or any pretrial motions, again explaining that he was unprepared despite being given multiple continuances over several months to prepare. During trial, defendant's opening statement did not address the charges against him or what he expected the evidence to show. His cross-examination of the witnesses largely consisted of irrelevant questions unrelated to the charges. He actually elicited testimony from J.G. and A.G. prejudicial to him, in particular, that he sexually assaulted J.G. day and night and that he required A.G. to have sex with him before going on sleepovers. He made no objections to the admission of the photographs of A.G. on his phone, or of the pink vibrator and lingerie, or to the videotape of J.G.'s forensic interview with Guadalupe Salgado, nor did he cross-examine Salgado. Defendant offered no evidence at trial. His closing argument was not based on evidence at trial. He filed no posttrial or post-sentencing motions.

¶ 67    We acknowledge that "a lack of legal sophistication, knowledge, or experience— manifested in the form of unsupported legal theories, unsuccessful strategies, and unwise tactical

decisions—is not a basis on which to find a defendant incompetent to waive counsel or his waiver of counsel ineffective." *McNutt*, 2020 IL App (1st) 173030, ¶ 96. This is not that case. Defendant did not exhibit any legal theories, strategies, or tactical decisions of any sort, whether supported or unsupported. Rather, the record shows that from December 9, 2020, when defendant was permitted to proceed *pro se*, until July 5, 2023, when the post-sentencing hearing was held, defendant did not file any pleadings or motions with the court, make any cohesive arguments in response to the State's motions, or mount a defense at trial. This is not a case where defendant mounted a poor defense because of a lack of legal training; this is a case where defendant mounted no defense due to mental illness.

¶ 68    Dr. Pan's diagnosis of defendant's mental illness, coupled with defendant's failure to perform the basic tasks necessary for his defense, differentiates this case from other cases where we held that the defendant was competent to represent himself without counsel. For example, in *McNutt*, 2020 IL App (1st) 173030, ¶ 91, ¶ 102, we held that the trial court did not abuse its discretion in finding that defendant was competent to represent himself where there was no evidence he suffered from mental illness and he performed basic tasks necessary for his defense. Specifically, he filed motions for substitution of judge and to suppress evidence, objected to the State's request for a DNA consumption order, struck two jurors during jury selection, made timely objections to the admission of evidence at trial, testified on his own behalf, and participated in the jury instructions conference. *Id.* ¶ 102. In *People v. Allen*, 401 Ill. App. 3d 840, 852 (2010), we held that the trial court committed no abuse of discretion in allowing defendant to represent himself, where a psychiatrist found him fit for trial and he proceeded to perform basic tasks necessary to his defense such as cross-examining witnesses, entering exhibits into evidence, objecting to witnesses' testimony, and submitting jury instructions. *Id.* By contrast, defendant here

was diagnosed with unspecified schizophrenia spectrum and other psychotic disorder manifesting in disorganized and paranoid thinking, which prevented him from performing the types of basic tasks necessary to his defense that were accomplished by the defendants in *McNutt* and *Allen*.

¶ 69    The State notes that in granting defendant's waiver, the court also determined that his mental illness was not severe enough under *Edwards* to deny his request for self-representation and it asks us to affirm that ruling. For purposes of whether a criminal defendant's mental illness is so severe as to render him incompetent to waive representation even if he can play the lesser role of represented defendant, *Edwards* held that the severity of the illness must be measured by whether it renders him incapable of conducting trial proceedings on his own. *Edwards*, 554 U.S. at 178. In the instant case, after testifying to defendant's unspecified schizophrenia spectrum and other psychotic disorder, Dr. Pan stated that he did not think defendant has symptoms so severe as to render him unfit for trial when represented by counsel. Dr. Pan further testified, though, that defendant's mental illness manifested itself in an extremely disorganized and paranoid thought process impairing his ability to represent himself. No other witness testified to the contrary. Dr. Pan's uncontradicted testimony regarding how defendant's mental illness affected his thinking so as render him unable to "mount his own defense by himself" was sufficient, under *Edwards*, to show that his mental illness was severe enough to render him incompetent to waive counsel. And, as discussed, Dr. Pan's testimony was supported by defendant's conduct before, during, and after trial, when he failed to perform even the basic tasks necessary to defend himself.

¶ 70    We recognize that the "mere fact that a psychiatrist expresses the opinion that the defendant is unfit does not require a similar finding by the trial court; it is the trial court's function to assess the credibility and weight to be given to a psychiatric expert's testimony." *People v. Baugh*, 358 Ill. App. 3d 718, 732 (2005). However, this is not a case where the trial court accepted

defendant's waiver of counsel because it found the psychiatric testimony incredible and/or outweighed or contradicted by other evidence or by defendant's demeanor and interactions with the court. Rather, the court's ruling that defendant was capable of representing himself during trial proceedings was based on its determination that Dr. Pan's finding of fitness to stand trial necessitated a finding of fitness for self-representation under *Godinez*. As discussed, the trial court's ruling misconstrues *Godinez* and runs counter to *Edwards*. The trial court also focused on Dr. Pan's testimony that defendant's symptoms were not indicative of "severe mental illness." As discussed, though, Dr. Pan qualified that testimony by explaining that the symptoms of defendant's mental illness included disorganized, delusional, and paranoid thinking rendering him unable to mount a defense on his own. Dr. Pan's uncontradicted testimony was sufficient under *Edwards* to show that defendant's mental illness was severe enough to render him incapable of self-representation and, when coupled with defendant's complete failure to perform even the most basic tasks necessary to his defense, compels us to conclude that the court abused its discretion and committed plain error by granting his request to proceed *pro se*.

¶ 71    Next, we consider the remedy for the trial court's error. *People v. Lego*, 168 Ill. 2d 561 (1996) is informative. In *Lego*, the defendant was charged with murder. *Id.* at 563. He waived his right to counsel, represented himself at trial, and was convicted and sentenced to death. *Id.* The defendant subsequently filed a postconviction petition alleging that an impaired mental condition had rendered him incapable of validly waiving the assistance of counsel. *Id.* At the hearing on the petition, the defendant provided the depositions of two experts who diagnosed him with a mental illness rendering him incapable of appreciating the dangers of waiving his right to counsel. *Id.* The postconviction court denied the petition. *Id.* Our supreme court found that the defendant's expert testimony was unrefuted by the State and established that his waiver of his right to counsel was

not knowing and intelligent and, as such, was invalid. *Id.* at 578-79. Therefore, the supreme court reversed the judgment of the circuit court denying postconviction relief, vacated the judgment of conviction and the sentence of death, and remanded for a new trial. *Id.* at 579. In the present case, for all the reasons discussed earlier in this order, defendant's waiver of the right to counsel was invalid under *Edwards* because his mental illness was severe enough to render him incapable of self-representation. In accordance with *Lego*, which held that an invalid waiver of counsel necessitates the vacating of the conviction and sentence and a remand for a new trial, we vacate defendant's judgment of conviction and sentence here and remand for the appointment of counsel and a new trial. If defendant again insists on representing himself, the court should order a new BCX as to defendant's fitness to proceed *pro se* and conduct a hearing on his fitness to proceed *pro se* with his appointed counsel and in accordance with this decision. If defendant is found fit to proceed *pro se*, then the court shall appoint stand-by counsel. If he is found unfit, the court shall decline defendant's request to proceed *pro se* and appoint counsel or co-counsel to represent him.

¶ 72     The evidence was sufficient to prove defendant guilty beyond a reasonable doubt and therefore there is no double jeopardy impediment to a new trial. See *People v. Naylor*, 229 Ill. 2d 584, 610-611 (2008). As a result of our disposition of this case, we need not address the other arguments on appeal.

¶ 73     Vacated and remanded.